UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

CAMILE SIANO ENDERS,

*Plaintiff*,

-against-

19-CV-00948
(BKS/CMF)

JERRY BOONE, et al.

_____
                                          *Defendants.*


## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT


LETITIA JAMES
Attorney General
State of New York
The Capitol
Albany, New York 12224-0341

Jonathan S. Reiner
Assistant Attorney General, of Counsel
Bar Roll No. 702645
Telephone:  518-776-2641
Fax:  518-915-7738 (Not for service of papers.)                Date: July 26, 2022

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................... 1

STATEMENT OF FACTS ................................................................................... 2

    A. Background and Parties ........................................................................... 2

    B. The First Investigation Into Plaintiff's Misuse Of State Resources ........................... 3

    C. Plaintiff Requests And Receives Approval To Conduct A Second Political Campaign—With The Express Limitation That She Not Campaign At DTF Or On DTF Time ........................................................................... 4

    D. Plaintiff Conducts The 2016 Campaign, In Part, At DTF And On DTF Time ........... 5

    E. The Second Investigation Into Plaintiff's Misuse Of State Resources Reveals Plaintiff Conducted Campaign Activities At DTF's Office And Pressured Multiple Subordinates To Donate To Her Campaign ................................. 7

    F. DTF Terminates Plaintiff ........................................................................ 10

    G. In Discovery, Plaintiff Fails To Provide Any Basis To Support Her Claim ............. 11

LEGAL STANDARD ....................................................................................... 12

ARGUMENT .................................................................................................. 13

    I. THE EVIDENCE DEMONSTRATES THAT PLAINTIFF DID NOT ENGAGE IN PROTECTED SPEECH ................................................... 14

    II. THE EVIDENCE DEMONSTRATES THAT DEFENDANT MANION TERMINATED PLAINTIFF FOR VIOLATING DIRECTIVES TO ABSTAIN FROM CAMPAIGNING AT DTF AND/OR USING DTF RESOURCES, NOT ENGAGING IN PROTECTED ACTIVITY ..................... 16

    III. DEFENDANT BOONE WAS NOT PERSONALLY INVOLVED IN PLAINTIFF'S TERMINATION ........................................................ 19

    IV. THE COURT SHOULD GRANT SUMMARY JUDGMENT TO ALL DEFENDANTS BASED ON QUALIFIED IMMUNITY ................................. 21

    V. THE COURT SHOULD DISMISS THE OFFICIAL CAPACITY CLAIMS BECAUSE PLAINTIFF FAILED TO ALLEGE THAT ANY DEFENDANT COULD PROVIDE THE PROSPECTIVE RELIEF SOUGHT ........................................................................................ 23

CONCLUSION ............................................................................................... 25

i

## PRELIMINARY STATEMENT

"There is not enough time in my day to keep a record of the unethical conduct I observe" Camile Siano Enders ("Plaintiff") engage in.  Neri Decl.; Neri Decl. Exh. G.  An eyewitness conveyed those words—continuing, "it never stops,"—to the Ethics Officer at the New York State Department of Taxation and Finance ("DTF").  Neri Decl. Exh. G.  The Ethics Officer sent that quote to DTF's Office of Internal Affairs ("OIA"), along with seven pages of notes the eyewitness typed detailing Plaintiff's incessant discussion of her campaign while at DTF, as well as Plaintiff's campaign-related absences from DTF.  Neri Decl.; Rivers Decl. Exh. A.  The OIA conducted an investigation, which included sworn statements from multiple witnesses, a review of documents, and synthesis of the evidence.  Gullie Decl.  The OIA then briefed the Executive Deputy Commissioner on the findings of the investigation.  Manion Decl.  Based upon the findings of the OIA investigation—the second formal investigation in less than a year to conclude Plaintiff had abused DTF resources—the Executive Deputy Commissioner decided to terminate Plaintiff for cause.  Manion Decl.

The DTF terminated Plaintiff from her position as Deputy Commissioner on August 24, 2016.  Dkt. 1 at ¶15.  Plaintiff initiated this action by filing a complaint on August 2, 2019 alleging a single cause of action: a Section 1983 First Amendment retaliation claim.  Dkt. 1 at 4–5.  Plaintiff sued the Executive Deputy Commissioner who fired her, the Human Resources official who assisted with the termination, and the Commissioner who approved the termination.  Dkt. 1 at ¶¶2, 4, 6, 16–19.  Plaintiff did not sue the eyewitness, anyone from OIA, the Ethics Officer, or DTF.  *See* dkt. 1.  The parties engaged in discovery.  *See* Reiner Decl.  Defendants now move for summary judgment.

## STATEMENT OF FACTS

**A.    Background and Parties**

Plaintiff served as a Deputy Commissioner at DTF from January 2013 to August 2016. Reiner Decl., Exh. A ("Dep. of Pl.") at 18. As a Deputy Commissioner, Plaintiff was an "exempt class employee" at DTF. Starr Decl. As an exempt class employee, Plaintiff served at the pleasure of the Administration, and her services could have been terminated at any time by the discretion of the Administration. Starr Decl. From January 2013 to March 2016, Plaintiff also held a "hold item" title. Starr Decl. A hold item is a competitive class position allocated to the employee while she serves in the exempt position. Starr Decl. The employee takes "discretionary leave" from the hold item while serving in the exempt class position. Starr Decl. Although the hold item sits vacant while the employee serves in the exempt class position, the agency still must budget for the hold item. Starr Decl. The granting of hold items is entirely at the discretion of the appointing authority. Starr Decl. The granting of discretionary leave from hold items—for a period of up to two years—is entirely in the discretion of the appointing authority. Starr Decl.

Plaintiff's discretionary leave from her hold item expired in March 2016. Boone Decl. After the expiration of her discretionary leave from her hold item in March 2016, Plaintiff continued to work at DTF only as an exempt class employee. Starr Decl.

DTF terminated Plaintiff's employment on August 24, 2016. Dkt. 1 at ¶15 (admitted by dkt. 17 at ¶15). Plaintiff re-joined the public payroll at the Schenectady County Public Defender's Office within six months of her termination from DTF. Dep. of Pl. at 16. Plaintiff currently serves as Deputy Chief Assistant Public Defender. Dep. of Pl. at 16.

Defendant Jerry Boone served as the Commissioner of DTF from 2015 to 2016, and he retired from DTF in 2016. Boone Decl. Defendant Honora Manion served as Executive Deputy Commissioner of DTF in 2015 and 2016, and she retired from DTF in March 2019. Manion Decl.

Defendant Mary Starr served as Assistant Director of Human Resources ("HR") at DTF in 2015 and 2016, and she retired from DTF in December 2018.  Starr Decl.

**B.     The First Investigation Into Plaintiff's Misuse Of State Resources**

In 2015, Plaintiff ran an unsuccessful campaign for re-election as a part-time Judge in the Duanesburg Town Court ("the 2015 Campaign").  Boone Decl.  When Plaintiff requested approval from DTF to conduct the 2015 Campaign, she received approval to conduct the campaign outside of work hours.  Boone Decl.

The New York State Inspector General ("IG") investigated Plaintiff for improperly conducting the 2015 Campaign on DTF time.[1]  Boone Decl.; Boone Decl. Exh. A.  The IG informed Defendant Boone that multiple witnesses observed Plaintiff placing and receiving calls— during the workday at DTF—pertaining to outside employment as a Town Judge and the 2015 Campaign.  Boone Decl.; Boone Decl. Exh. A.  The IG indicated that Plaintiff's cell phone records reflect that Plaintiff made 33 hours of calls related to the 2015 Campaign and/or work as a Town Judge during a 30-week period.  Boone Decl.; Boone Decl. Exh. B.  The IG further indicated that Plaintiff's cell phone records confirmed that Plaintiff made 24 hours of calls related to the 2015 Campaign and/or work as a Town Judge during a one-month period.  Boone Decl.; Boone Decl. Exh. B.

The IG did not make a recommendation as to how to proceed as to Plaintiff's misconduct because Plaintiff lost the 2015 campaign.  Boone Decl.; Boone Decl. Exh. B.  Based upon the IG's findings that Plaintiff used DTF time to conduct outside work on DTF time, Defendant Boone exercised his discretion not to renew Plaintiff's discretionary leave from her hold item when it was

---

[1] The IG is independent of DTF and conducts oversight of all State executive agencies.  *See* N.Y. Exec. L. §52.

set to expire in March of 2016.  Boone Decl.; Dep. of Pl. at 114.  Plaintiff "felt that [non-renewal of the hold item] was punishment."  Dep. of Pl. 115.  However, Defendant Boone indicated to Plaintiff that they could revisit the possibility of a hold item in the future.  Boone Decl.

**C.    Plaintiff Requests And Receives Approval To Conduct A Second Political Campaign—With The Express Limitation That She Not Campaign At DTF Or On DTF Time**

On March 28, 2016, Plaintiff requested permission from DTF to conduct a campaign for New York State Supreme Court ("the 2016 Campaign").  Neri Decl.; Neri Decl. Exh. A.  Plaintiff's request to DTF to conduct the 2016 Campaign specifically mentioned ethics advisory opinion 98-12.  Neri Decl. Exh. A.  Advisory Opinion 98-12 indicates that employees cannot conduct "campaign activities from a State office." Neri Decl. Exh. D at 5. It also indicates employees cannot campaign "during State business hours unless leave is taken."  Neri Decl. Exh. D at 5.

DTF approved Plaintiff's request to conduct the 2016 Campaign, subject to specific restrictions.  Neri Decl. Exh. A.  Those restrictions included: (i) "All activities must be done on the employee's own time"; (ii) "No State resources of any type may be used to accomplish your outside activity"; and (iii) a "Reminder:  Civil Service Law section 107 prohibits any and all political activity in the workplace."  Neri Decl. Exh. A.  A state employee's time during the workday is a state resource.  Neri Decl.

On April 1, 2016, Defendant Boone and Deputy Commissioner and Ethics Official Margaret Neri met with Plaintiff to discuss the restrictions on her activity.  Neri Decl.  At that meeting, Defendant Boone expressed concern that the campaign would interfere with Plaintiff's duties as Deputy Commissioner at DTF.  Neri Decl.  Defendant Boone asked Plaintiff to be mindful of the fact that she would be highly visible both within DTF and to the public at large, and he reminded Plaintiff that there is increased scrutiny of state employees engaging in political activity.

4

Neri Decl.  Plaintiff indicated to Defendant Boone that she could conduct the campaign entirely outside of DTF hours.  Neri Decl.

On April 5, 2016, Deputy Commissioner Neri sent an e-mail to Plaintiff, with Defendant Boone cc'd, recapping the April 1, 2016 meeting.  Neri Decl; Neri Decl. Exh. C.  In that e-mail, Deputy Commissioner Neri quoted State Ethics Commission Advisory Opinion 93-9 to Plaintiff: "'One area of particular concern for those seeking elected office is the abuse of State time and resources. . . .  The law requires that the campaigns be run on an employee's own time.  No state resources of any type, including . . . support staff assistance can be used in the furtherance of the campaign.'"  Neri Decl; Neri Decl. Exh. C.

In March of 2016, Plaintiff also requested permission from the Joint Commission on Public Ethics ("JCOPE") to conduct the 2016 Campaign.  Neri Decl.  JCOPE approved Plaintiff's request to conduct the 2016 Campaign.  Neri Decl.; Neri Decl. Exh. B.  JCOPE's approval letter to Plaintiff specifically mentioned advisory opinion 98-12, the same advisory opinion Plaintiff referenced in her request to DTF.  Neri Decl. Exh. A; Neri Decl. Exh. B.  JCOPE's approval letter also indicated that Plaintiff may not use any State resources, including "computers or support staff."  Neri Decl. Exh. B.  JCOPE's approval letter continued: the "law also prohibits the use of one's official State position to coerce, intimidate, or otherwise influence State employees to give money or service or any valuable thing for any political purpose or influence the political action of any person."  Neri Decl. Exh. B.

**D.      Plaintiff Conducts The 2016 Campaign, In Part, At DTF And On DTF Time**

In early April 2016, Margaret Neri—DTF's Ethics Officer and a Deputy Commissioner— asked Lynn Rivers—Plaintiff's administrative assistant who reported directly to Plaintiff—to keep track of Plaintiff's campaign activities while at DTF.  Neri Decl; Rivers Decl.  No Defendant asked

Deputy Commissioner Neri to get Ms. Rivers to provide information about Plaintiff, and no Defendant was present when Deputy Commissioner Neri asked Ms. Rivers to provide information about Plaintiff.  Neri Decl.; Rivers Decl.  Rather, Deputy Commissioner Neri made the request of Ms. Rivers on her own volition, and in her capacity as Ethics Officer, based upon her own concerns that Plaintiff was flouting the ethical restrictions placed on her.  Neri Decl.  Ms. Rivers complied with Deputy Commissioner Neri's request and kept contemporaneous notes of what she observed. Rivers Decl.

On June 2, 2016, an attorney from DTF's Office of Counsel forwarded Deputy Commissioner Neri a campaign e-mail that Plaintiff's campaign had sent to the attorney's DTF e-mail address.  Neri Decl.; Neri Decl. Exh. E.  In turn, Deputy Commissioner Neri forwarded the e-mail to the Director of DTF's Office of Internal Affairs ("OIA").  Neri Decl.; Neri Decl. Exh. E. Deputy Commissioner Neri also sent an e-mail to Plaintiff to inquire why she was sending political e-mails to State e-mail addresses.  Neri Decl.; Neri Decl. Exh. F.  Plaintiff responded to Deputy Commissioner Neri's e-mail by speculating that her campaign sent an e-mail to a bar association and that "[m]aybe some members use their state agency email addresses for [the] women's bar association membership."  Neri Decl.; Neri Decl. Exh. F.

In further response to the inappropriate e-mail, Defendant Manion reminded Plaintiff that she needed to be more cautious about the use of State time and resources—including use of work time and DTF e-mail—and that even the appearance of not following the rules was a problem. Manion Decl.

**E.    The Second Investigation Into Plaintiff's Misuse Of State Resources Reveals Plaintiff Conducted Campaign Activities At DTF's Office And Pressured Multiple Subordinates To Donate To Her Campaign.**

After discussing the e-mail with Plaintiff, Defendant Manion heard that Plaintiff had been discussing the campaign at DTF with DTF workers, including Deputy Commissioner Richard Ernst; and had been making campaign-related calls while at DTF. Manion Decl. At this time, Defendant Manion was already aware that the IG previously determined that Plaintiff had abused state time and resources. Manion Decl. Defendant Manion therefore referred the matter to OIA to investigate. Manion Decl.

Part of OIA's investigation gathered evidence from Administrative Assistant Lynn Rivers. Gullie Decl.; Gullie Decl. Exhs. B and C; River Decl.; Rivers Decl. Exh. B. During the spring and summer of 2016, Ms. Rivers' desk was right outside of Plaintiff's office. Rivers Decl. In an affidavit to OIA, Ms. Rivers provided numerous examples of Plaintiff discussing her political campaign while at DTF with Deputy Commissioner Ernst. Rivers Decl.; Rivers Decl. Exh. A; Rivers Decl. Exh. B. Further, Ms. Rivers informed OIA of multiple examples of Plaintiff discussing her political campaign while on the phone at DTF. Rivers Decl.; Rivers Decl. Exh. B. For example—although Defendant Manion had recently reminded Plaintiff about the importance of avoiding even the appearance of not following the rules—on June 13, 2016, Plaintiff discussed upcoming political events with the staff of the Bureau of Conciliation and Mediation Services ("BCMS") while at the DTF office. Rivers Decl.; Rivers Decl. Exh. B. As Plaintiff then served as both Deputy Commissioner and Director of BCMS, Plaintiff supervised all of those employees present for her discussion of the upcoming political events. Dep. of Pl. at 19. At various other times at the DTF office, Plaintiff also provided Ms. Rivers with an emery board promoting her

campaign and campaign literature, and Plaintiff asked Ms. Rivers to review headshots for her political campaign.  Rivers Decl.

On one occasion in the spring or summer of 2016, Plaintiff asked Ms. Rivers for her home address, and Ms. Rivers felt obligated to acquiesce because Plaintiff was her supervisor.  Rivers Decl.  After extracting the home address from Ms. Rivers, Plaintiff sent her subordinate an invitation for a fundraiser for her campaign.  Rivers Decl.; Rivers Decl. Exh. C.  Advisory Opinion 98-12—which Plaintiff cited in her request to DTF to conduct the 2016 campaign—reads, in pertinent part, that "no State employee may solicit from subordinates, as this practice is strictly forbidden by Civil Service Law § 107."  Neri Decl. Exh. D at 5.

OIA compared Ms. Rivers' affidavit and notes detailing when Plaintiff was out of the office with the timesheets that Plaintiff certified.  Gullie Decl.; Gullie Decl. Exh. D.  This comparison revealed that Plaintiff did not always charge appropriate leaves when (i) out of the office for political events or (ii) when conducting non-DTF business while physically present at DTF.  Gullie Decl.  DTF therefore paid Plaintiff without reducing her leave time, and Plaintiff effectively stole the value of her leave time that she should have been charged.  Gullie Decl.

The OIA investigation gathered evidence from Lisa Surprenant, another Administrative Assistant who worked directly for Plaintiff.  Gullie Decl.; Gullie Decl. Exh E; Surprenant Decl.; Surprenant Decl. Exh. A. On multiple occasions in the spring and summer of 2016, Plaintiff stopped by Ms. Surprenant's desk at DTF to discuss her political campaign.  Surprenant Decl.  On one of those occasions, Plaintiff asked Ms. Surprenant if Ms. Surprenant's husband had friended the Facebook account of her political campaign.  Surprenant Decl.; Surprenant Decl. Exh. A.

On July 13, 2016, while Ms. Surprenant was at work at DTF, Plaintiff asked her if she received an invitation to her fundraiser for her political campaign—which was held on July 12,

2016—and Plaintiff became very upset when Ms. Surprenant said no.   Surprenant Decl.;

Surprenant Decl. Exh. A.  This interaction made Ms. Surprenant uncomfortable.  Surprenant Decl.

The very next day, Deputy Commissioner Richard Ernst—the executive with whom Plaintiff

incessantly discussed her campaign while at the office, as per Ms. Rivers—stopped at Ms.

Surprenant's desk and asked if Ms. Surprenant needed the address to Plaintiff's campaign.

Surprenant Decl.; Surprenant Decl. Exh. A; Rivers Decl.  Ms. Surprenant clearly indicated that

she did not want to participate or contribute to the campaign.  Surprenant Decl.; Surprenant Decl.

Exh. A.  The pressure from Plaintiff and Ernst—both of whom were Deputy Commissioners—on

consecutive days to contribute financially to Plaintiff's campaign made Ms. Surprenant

uncomfortable.  Surprenant Decl.  On July 14, 2016, Ms. Surprenant wrote a sworn affidavit for

the OIA investigation detailing her interactions with Plaintiff and Deputy Commissioner Ernst.

Surprenant Decl.; Surprenant Decl. Exh. A.  And although Ms. Surprenant told both Plaintiff and

Deputy Commissioner Ernst that she had no interest in funding Plaintiff's campaign, Ms.

Surprenant received an invitation for a fundraiser for Plaintiff at her home address.  Surprenant

Decl.; Surprenant Decl. Exh. B.

On August 4, 2016, Ms. Rivers provided Deputy Commissioner Neri with typed notes

about Plaintiff's conduct.  Neri Decl.; Neri Decl. Exh. G.  When handing Deputy Commissioner

Neri the notes, Ms. Rivers commented, "There is not enough time in my day to keep a record of

the unethical conduct I observe in my particular location.  Richard [Ernst] and [Plaintiff] discuss

the campaign frequently throughout the day.  It never stops."  Neri Decl.; Neri Decl. Exh. G.

Deputy Commissioner Neri forwarded a scanned copy of the written notes to Michele Somelofske,

an Investigator with OIA.  Neri Decl.  The e-mail in which Deputy Commissioner Neri sent the

notes to OIA also included Ms. Rivers' comment about the breadth of Plaintiff's unethical conduct

in the workplace.  Neri Decl. Exh. G.  OIA concluded that Plaintiff conducted her political campaign, in part, physically at DTF and on DTF time.  Gullie Decl.

As of the date of Plaintiff's deposition—April 8, 2022—Plaintiff had no knowledge that she had been investigated by OIA or the content of that investigation.  Dep. of Pl. at 111.

## F.     DTF Terminates Plaintiff

OIA briefed Defendant Manion on the results of the investigation.  Manion Decl. During that briefing, Defendant Manion learned that the investigation revealed evidence that Plaintiff had, in fact, violated the restrictions about not using DTF time and resources to conduct the campaign. Manion Decl.  Based on that briefing of investigative findings, Defendant Manion determined that Plaintiff should be terminated for cause because she violated the restrictions placed on her by the Commissioner of DTF and JCOPE.  Manion Decl.  Defendant Manion made that decision, in part, because the OIA determination constituted the second time in less than a year an investigative agency found Plaintiff misused DTF time and resources to conduct outside activity.[2]  Manion Decl. Defendant Manion informed Defendant Starr that Plaintiff would be terminated for inappropriate use of DTF resources during a political campaign.  Starr Decl.; Manion Decl.  Defendant Starr drafted a termination letter, which Defendant Manion edited by adding "for cause."  Starr Decl.

Defendant Boone was on medical leave at the time Plaintiff was terminated and did not make the decision to terminate Plaintiff.  Boone Decl.  When Defendant Manion informed Defendant Boone that she planned on terminating Plaintiff, Defendant Boone agreed with that course of action.  Boone Decl.; Manion Decl.

On August 24, 2016, Defendant Manion informed Plaintiff she was terminated for cause. Manion Decl.  Defendant Starr was present when Defendant Manion terminated Plaintiff.  Manion

---

[2] Richard Ernst did not have a similar history of ethical infractions.  Manion Decl.

Decl. Plaintiff understood that her employment was at-will because she was an exempt class employee. Manion Decl. Defendant Manion did not provide Plaintiff any details about the cause at that time. Manion Decl.

Plaintiff subsequently began telling people, falsely, that she was terminated for political reasons. Manion Decl. The New York State Executive Chamber urged Defendant Manion to speak with Plaintiff to provide additional details about her termination. Manion Decl. On or about September 2, 2016, Defendant Manion conducted a call with Plaintiff, with Defendant Starr in the room as a witness. Manion Decl. In that call, Plaintiff asked whether her termination had anything to do with Plaintiff's campaign for Supreme Court. Manion Decl. Defendant Manion responded, in sum and substance, that the termination occurred because Plaintiff conducted campaign activity at DTF. Manion Decl.

## G.    In Discovery, Plaintiff Fails To Provide Any Basis To Support Her Claim

Plaintiff's only allegation of retaliation in the complaint is that the Defendants "terminated Plaintiff for participating in the Judicial Campaign." Dkt. 1 at ¶21. When given an interrogatory to expound on paragraph 21 of the complaint, Plaintiff wrote,

> The Basis for the allegation in Paragraph 21 of the complaint: On August 24, 2016, Ms. Manion and Mary Starr called Plaintiff into her office and told her she was being fired for cause because of her campaign. . . .  In a telephone call from Ms. Manion and Mary Starr on or about September 2, 2016 to Plaintiff, Nonie stated that Plaintiff was fired for cause for failing to follow direct orders not to engage in campaign activities in the workplace. . . .  She further stated it was not about calls but the appearance and 'discussion all over the place.'. . .  Based upon the general reference to Plaintiff's campaign, with no finding of wrong doing [sic], indicates that Plaintiff was fired merely because she had a campaign.

Reiner Decl., Exh. B ("Pl's Interrogatory Answer").

When Plaintiff was asked at her subsequent deposition "what actions did [Defendant Boone] take that were retaliatory to your knowledge," Plaintiff testified "I don't know exactly."

Dep. of Pl. at 46.  When Plaintiff was asked what Defendant Manion beyond the mere act of termination, Plaintiff testified "I don't recall."[3]  Dep. of Pl. at 50–51.  When Plaintiff was asked at her deposition "what did [Defendant Starr] do that was retaliatory," Plaintiff testified "She was present when I was terminated by Nonie Manion.  I don't know what else she would have done.  I don't know the rest."  Dep. of Pl. at 55.  When asked whether she knew how "Defendant Starr was involved in the decision to terminate you," Plaintiff testified "no."  Dep. of Pl. at 56.  When asked whether she spoke with Defendant Starr after leaving DTF on August 24, 2016, Plaintiff testified "I don't recall."  Dep. of Pl. at 44.

To date, Plaintiff has not identified any speech beyond "participating in a campaign" she believes led to her termination.

## LEGAL STANDARD

Pursuant to Rule 56, summary judgment is appropriate if there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law . . . Factual disputes that are irrelevant or unnecessary will not be counted."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Id.*

The movant bears the initial burden of demonstrating that there is no genuine issue of material fact.  *See Celotex*, 477 U.S. at 323.  If this initial burden is met, the opposing party must show that there is a material dispute of fact for trial.  *See* Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S.

---

[3] Plaintiff—an executive attorney in a public litigation office who has been pressing this case for nearly six years—testified that she could not recall answers to more than 80 questions at her deposition.  Dep. of Pl.

at 324. Furthermore, "[w]hen the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim." *Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009) (citing *Celotex*, 477 U.S. at 322–23).

Although the evidence and reasonable inferences should be construed in favor of the non-movant, the non-movant must nonetheless "do more than simply show that there is some metaphysical doubt as to the material facts." *Matushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). To defeat a motion for summary judgment, the non-movant must point to specific evidence showing a genuine issue for trial. *See Salahuddin v. Goord*, 467 F.3d 263, 273 (2d Cir. 2006). "Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) (citation omitted); *Yennard v. Boces*, 353 F. Supp. 3d 194 (N.D.N.Y. 2019).

While "a court is ordinarily obligated to afford a special solicitude to *pro se* litigants, . . . a lawyer representing himself ordinarily receives no such solicitude at all." *Tracy v. Freshwater*, 623 F.3d 90, 101–02 (2d Cir. 2010). That being said, even when a party without legal experience proceeds *pro se*, her bald assertion, unsupported by evidence, is not sufficient to overcome a motion for summary judgment. *Cucuta v. New York City*, 25 F. Supp. 3d 400, 409 (S.D.N.Y. 2014); *Roseboro v. Gillespie*, 791 F. Supp. 2d 353, 364 (S.D.N.Y. 2011); *see Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991).

## ARGUMENT

"The First Amendment generally prohibits government officials from dismissing or demoting an employee because of the employee's engagement in constitutionally protected political activity." *Heffernan v. City of Paterson*, 578 U.S. 266, 268 (2016). In order to establish a First Amendment retaliation claim under Section 1983, a public employee such as Plaintiff must

demonstrate that: "(1) his or her speech was constitutionally protected; (2) he or she suffered an adverse employment action; and (3) a causal connection exists between the speech and the adverse employment action." *Washington v. Cnty. of Rockland*, 373 F.3d 310, 320 (2d Cir. 2004); *accord. Cotarelo v. Village of Sleepy Hollow Police Dep't*, 460 F.2d 247, 251 (2d Cir. 2006). The evidence in this matter forecloses the possibility that Plaintiff can meet the first and third elements, engaging in constitutionally protected speech and a causal connection between the speech and termination. Accordingly, the Court should grant summary judgment to all Defendants.

## I.   The Evidence Demonstrates That Plaintiff Did Not Engage In Protected Speech.

"To be protected, the speech must be on a matter of public concern, and the employee's interest in expressing herself on this matter must not be outweighed by any injury the speech could cause to 'the interest of the state, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Waters v. Churchill*, 511 U.S. 661, 668 (1994) (quoting *Connick v. Myers*, 461 U.S. 138, 142 [1983]). Speech is considered to deal with matters of public concern "when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Snyder v. Phelps*, 562 U.S. 443, 453 (2011) (internal quotation marks omitted). By contrast, speech that "primarily concerns an issue that is personal in nature and generally related to [the speaker's] own situation, such as his or her assignments, promotion, or salary, does not address matters of public concern." *Jackler v. Byrne*, 658 F.3d 225, 236 (2d Cir. 2011) (internal quotation marks omitted); *see also Ezekwo v. N.Y.C. Health & Hosps. Corp.*, 940 F.2d 775, 781 (2d Cir. 1991) (upholding the dismissal of a medical resident's First Amendment claim involving complaints about aspects of residency program that negatively affected her because those complaints were "personal in nature and generally related to

her own situation").  Among the relevant considerations in deciding if speech addresses a matter of public concern "is whether the speech was calculated to redress personal grievances or whether it had a broader public purpose." *Singer v. Ferro*, 711 F.3d 334, 339 (2d Cir. 2013).

The "State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968).  A "citizen, upon entering government service, by necessity must accept certain limitations on his or her freedom." *Jackler v. Burns*, 658 F.3d 225, 234 (2d Cir. 2011); *see also Singer*, 711 F.3d at 339 (explaining that "public employment does substantially curtail the right to speak freely in a government workplace").  The government can create restraints on the "speech of public employees that would be plainly unconstitutional if applied to the public at large." *United States v. Nat'l Treasury Employees' Union*, 513 U.S. 454, 465 (1995).  For example, "political campaigning on the part of [government] employees may constitutionally be prohibited." *United States Civ. Serv. Comm'n v. Nat'l Ass'n of Letter Carriers*, 413 U.S. 548, 567 (1973); *see also Broadrick v. Oklahoma*, 413 U.S. 601 (1973) (applying *Letter Carriers* to a state's restriction on political activities by state employees).

Here, Plaintiff alleges that she was terminated for broadly participating in a judicial campaign. Dkt. 1 at ¶21.  The evidence, however, demonstrates DTF permitted Plaintiff to conduct a campaign in 2016, just like it did in 2015.  Neri Decl.  The restriction DTF imposed upon Plaintiff—and which Plaintiff violated, leading to her termination—was far narrower than what Plaintiff pleaded:  campaigning in the workplace using state resources.  Neri Decl.; Neri Decl. Exhs. A & B.  The conduct which the evidence demonstrates led to Plaintiff's termination is not constitutionally protected:  "Even something as close to the core of the First Amendment as

participation in political campaigns may be prohibited to government employees." *Waters*, 511

U.S. at 672.  There is no evidence whatsoever that any Defendant took action against Plaintiff for

campaigning outside of the workplace while not on government time—even though such action

would be constitutional.  Rather, all of the evidence shows that Defendant Manion terminated

Plaintiff's at-will employment for violating orders not to campaign <u>in a state workplace using state</u>

<u>resources</u>.  Manion Decl.; Neri Decl.; Gullie Decl.; Starr Decl.; *see also* Dep. of Pl. (Defendant

Manion called "to let me know that I was fired for cause, for failure to follow direct orders not to

engage in campaign activities in the workplace"); Pl's Interrogatory Answer ("In a telephone call

from Ms. Manion and Mary Starr on or about September 2, 2016 to Plaintiff, Nonie stated that

<u>Plaintiff was fired for cause for failing to follow direct orders not to engage in campaign activities</u>

<u>in the workplace</u>") (emphasis added).  Accordingly, the Court should grant summary judgment

because Plaintiff has failed to provide evidence that she engaged in constitutionally protected

speech.  *See Letter Carriers*, 413 U.S. at 567; *Cordiano*, 575 F.3d at 204 (affirming summary

judgment where the moving party established an absence of proof to go to the trier of fact).

## II.     The Evidence Demonstrates That Defendant Manion Terminated Plaintiff For Violating Directives To Abstain From Campaigning At DTF And/Or Using DTF Resources, Not Engaging In Protected Activity.

Even assuming Plaintiff's evidence established a *prima facie* case—and it does not—the

burden would then shift to Defendants "to offer some legitimate, non-retaliatory rationale for

[their] actions." *Dillon v. Suffolk Cnty. Dep't of Health Svcs.*, 917 F.Supp.2d 196, 204 (E.D.N.Y.

2013); *see Blum v. Schlegel*, 18 F.3d 1005, 1010 (2d Cir. 1994) (after a plaintiff makes the initial

showing, "the defendant has the opportunity to demonstrate by a preponderance of the evidence it

would have taken the same adverse employment action even in the absence of the protected

conduct").  Even where the evidence establishes a Defendant's action was motivated by both

proper and retaliatory motives, claims of pretext are irrelevant. *Deep v. Coin*, 453 F. App'x 49, 55 (2d Cir. 2011); *see Mount Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977) (providing employers who took adverse action against an employee on the basis of the employee's protected conduct with an opportunity to prove they would have taken the same adverse action in the absence of the protected conduct).[4]  The Supreme Court held that assessing a government employer's action, a court must "look to the facts as the employer <u>reasonably</u> found them to be." *Waters*, 511 U.S. at 677 (emphasis in original).

Here, there is no dispute that Plaintiff knew (1) the restrictions DTF placed on her, *see* Neri Decl. Exh. A; (2) the restrictions that JCOPE placed on her, Neri Decl. Exh. B; (3) that Defendant Manion received a briefing from the Office of Internal Affairs which indicated that Plaintiff violated those restrictions, Manion Decl; (4) that Defendant Manion decided to terminate Plaintiff after receiving that briefing, Manion Decl; (5) the OIA investigation upon which Defendant Manion was briefed included sworn statements from two eyewitnesses detailing Plaintiff's campaigning in the workplace after Plaintiff was informed of the restrictions, Gullie Decl.; Gullie Decl. Exhs. B & E; (6) that the OIA investigation included sworn statements from two of Plaintiff's subordinates that she extracted their home addresses and then sent them solicitations to fund Plaintiff's campaign, Gullie Decl. Exhs. B & E; (7) that the OIA investigation concluded—based on a comparison of when Lynn Rivers documented Plaintiff's absence from the office to Plaintiff's timesheets—that Plaintiff did not charge leave accruals while out of the office campaigning, Gullie Decl; (8) that a state employee's time during the duty day is a state resource, Neri Decl; (9) that Plaintiff was disciplined less than a year earlier for violating substantially similar rules relating to conducting non-DTF business on DTF time, Boone Decl.; Manion Decl.; Dep. of Pl. at 115; or

---

[4] Defendants' answer asserted a *Mount Healthy* defense.  Dkt. 17 at ¶43.

(10) that Defendant Manion knew of Plaintiff's disciplinary history for violating ethical rules, Manion Decl.  The undisputed evidence provides a substantial, legitimate, non-retaliatory basis for Defendant Manion's decision to terminate Plaintiff.

The evidence also demonstrates that Defendant Starr took no action in Plaintiff's termination in reaction to anything Defendant Starr thought Plaintiff did.  Rather, Defendant Starr first became involved when Defendant Manion—the acting head of the agency for which Defendant Starr worked—informed Defendant Starr that "Plaintiff would be terminated for inappropriate use of DTF resources during a political campaign."  Starr Decl.  By the time Defendant Starr—at the time, DTF's Assistant Director for Human Resources—became involved in the process, the decision to terminate had already been made.  Plaintiff conceded she did not know what role Defendant Starr played in the termination.  Dep. of Pl. at 56.  Accordingly, Plaintiff could not articulate any retaliatory conduct by Defendant Starr.  Dep. of Pl. at 44.  Defendant Starr filled in Plaintiff's knowledge gaps:  Defendant Starr drafted a termination letter at Defendant Manion's direction, was present when Defendant Manion informed Plaintiff that she was terminated and was present for a post-termination call.  Starr Decl.  No evidence demonstrates that Defendant Starr took action *because* of any protected speech.  Rather, Defendant Starr took action because the senior official at the agency told her to do so.

Similarly, the evidence shows Defendant Boone did not take action against Plaintiff for engaging in any conduct, protected or otherwise.[5]  Rather, the evidence demonstrates Defendant

---

[5] To the extent that Plaintiff asks the Court to consider Defendant Boone's decision to not renew Plaintiff's discretionary leave from her hold item when it expired in March 2016—a decision Defendant Boone made after the IG informed him that Plaintiff had been abusing DTF time to conduct non-DTF business—an act of retaliation, such action is neither mentioned in the complaint nor within the statute of limitations.  *See* dkt. 1; Starr Decl.; Boone Decl.; *see also Lucente v. Cnty. of Suffolk*, 980 F.3d 284, 308 (2d Cir. 2020) ("The statute of limitations for § 1983 actions arising in New York is three years.")

Boone was out of the office on medical leave at the time Defendant Manion decided to terminate Plaintiff, and Defendant Boone simply agreed with his subordinate's decision.  Boone Decl.  As argued in Section III, *infra*, merely approving a subordinate officer's decision—and the evidence demonstrates Defendant Boone agreed with the decision but did not necessarily have to approve it—does not establish Section 1983 liability.

A "showing of retaliatory intent is required for a retaliatory first amendment claim." *Greenwich Citizens Comm. v. Counties of Warren & Washington Indus. Def. Agency*, 77 F.3d 26, 32 (2d Cir. 1996).  Not only does the evidence fail to establish a retaliatory intent, but the evidence affirmatively demonstrates a legitimate, non-retaliatory motive for Defendants' actions.  The facts as Defendant Manion reasonably found them to be indicate that Plaintiff violated directives by both DTF and JCOPE not to campaign at the office using office resources.[6]  Defendant Starr (an HR professional) merely helped Defendant Manion (Defendant Starr's organizational superior) execute her decision.  And Defendant Boone merely approved Defendant Manion's decision.  The Court should grant the Defendants summary judgment on the merits.

## III.   Defendant Boone Was Not Personally Involved In Plaintiff's Termination.

"Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under §1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994).  There "is no special rule for supervisory liability.  Instead, a plaintiff must plead and prove 'that each Government-official defendant, through the individual's own actions, has violated the constitution.'" *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 [2009]).  A plaintiff "must therefore establish [each defendant] violated the

---

[6] The relevant inquiry is only whether Defendant Manion <u>reasonably</u> concluded, not whether Defendant Manion was, in fact, correct. *See Waters*, 511 U.S. at 677.  That said, the evidence demonstrates Plaintiff actually violated the ethical restrictions placed on her.

[Constitution] by [his own] conduct, not by reason of [his] supervision of others who committed the violation." *Id.* at 619.

Plaintiff alleges that, "[b]ecause of her rank as a Deputy Commissioner, any decision to terminate Plaintiff had to be made with the knowledge and approval of Commissioner Boone."[7, 8] Dkt. 1 at ¶19.   Defendant Boone acknowledges that he did approve Defendant Manion's determination to terminate Plaintiff.  Boone Decl.  However, "supervisory approval, without more, is insufficient to show any personal involvement." *Washington v. Piper*, 2019 U.S. Dist. LEXIS 206338, at *6 (S.D.N.Y. 2019).  The "'mere fact that a supervisory official affirmed the [discipline]

---

[7]  In the alternative to granting Defendant Boone summary judgment, the Court should dismiss the case as to him for a failure to state a claim pursuant to Rule 12(b)(6).  A "trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." *Schwartz v. Compagnie Gen. Transatlantique*, 405 F.2d 270, 273-74 (2d Cir. 1968); *see Bradley v. Rell*, 703 F. Supp. 2d 109, 114 (N.D.N.Y. 2010).

A complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (*quoting Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 [2007]).  Although the court should accept factual allegations as true and draw reasonable inferences in the plaintiff's favor (*see Holmes v. Grubman*, 568 F.3d 329, 335 (2d Cir. 2009)), "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" are insufficient to withstand a motion to dismiss because such statements are not entitled to the presumption of truth. *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Twombly*, 550 U.S. at 570.

Plaintiff's only well-pleaded allegation against Defendant Boone is that he agreed with Defendant Manion's decision to fire Plaintiff. Dkt. 1 at ¶20.  The complaint does not provide any non-conclusory allegations that Defendant Boone took any retaliatory action.  Accordingly, Plaintiff failed to adequately plead Defendant Boone's personal involvement.

[8]  While Plaintiff is not due any of the special solicitude normally owed a pro se litigant because she is a seasoned, high-ranking litigator with decades of legal experience (*see supra*; *see also* Dep. of Pl. at 27), the Court should be even less inclined to grant any leniency on deficiencies in the complaint, which was drafted and filed by counsel nearly three years before Plaintiff elected to represent herself.  *See* dkt. 1; dkt. 49.

will not suffice to establish that official's personal involvement, which is a prerequisite to liability under §1983.'" *Caimite v. Rodriguez*, 2020 U.S. Dist. LEXIS 64174, at *24–25 (N.D.N.Y. 2020) (Hummel, M.J.) (quoting *Collins v. Ferguson*, 804 F.Supp.2d 134, 140 [W.D.N.Y. 2011]) *rep. and rec. adopted by* 2020 U.S. Dist. LEXIS 174205 (N.D.N.Y. 2020).   The only concrete action Plaintiff has alleged—approving the decision to terminate—is insufficient to establish Defendant Boone's personal involvement.   The undisputed evidence demonstrates that Defendant Boone did no more than approve the termination.   Accordingly, the Court should grant Defendant Boone summary judgment based on the absence of his personal involvement.

## IV.   The Court Should Grant Summary Judgment To All Defendants Based On Qualified Immunity.[9]

Qualified immunity protects government officials from civil liability in the performance of discretionary functions "as long as their actions <u>could reasonably have been</u> thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton*, 483 U.S. 635, 638 (1987) (emphasis added).   It "shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Soto v. Gaudett*, 862 F.3d 148, 156 (2d Cir. 2017).   A right only becomes "clearly established" when "the contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right. . . .   The unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).   Officials are "entitled to qualified immunity when their decision was reasonable, even if mistaken; the doctrine gives ample room for mistaken judgments." *Hunter v. Bryant,* 502 U.S. 224, 229 (1991).   Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Taylor v. Barkes*, 575 U.S. 822,

---

[9] Defendants' answer asserted a qualified immunity defense.  Dkt. 17 at ¶38.

825 (2015) (internal citations and quotations marks omitted); *Mara v. Rilling*, 921 F.3d 48, 69 (2d Cir. 2019).  Moreover, "a defense of qualified immunity may not be rebutted by evidence that the defendant's conduct was malicious or otherwise improperly motivated.  Evidence concerning the defendant's subjective intent is simply irrelevant to that defense."  *Crawford-El v. Britton*, 523 U.S. 574, 588 (1998).

Given the Supreme Court's explicit approval of restrictions on political activity by government employees, it was not clearly established that Plaintiff could not be terminated for conducting political activity in the workplace.  *See Letter Carriers*, 413 U.S. at 567 ("political campaigning on the part of [government] employees may constitutionally be prohibited").  *Letter Carriers* arguably permitted Defendants to prohibit Plaintiff from engaging in <u>any</u> partisan political campaign.  Yet the only restriction placed upon Plaintiff was to avoid using State resources to conduct political activity.  *See Hotel Employees & Rest. Employees Union v. N.Y.C. Dep't of Parks & Rec.*, 311 F.3d 534, 545 (2d Cir. 2002) (permitting content-neutral restrictions even in public forum); *see also Moore v. U.S. Postal Serv.*, 159 F. App'x 265, 267 (2d Cir. 2005) (explaining that a government office is "most accurately characterized as a non-public forum, a location that the government has not opened for expressive activity by members of the public" and thus can be subject to greater restrictions).

The evidence demonstrates that OIA advised Defendant Manion that Plaintiff failed to follow a simple, constitutionally-permissible directive:  keep the campaign out of the workplace.  The evidence further demonstrates that Defendant Manion decided to take adverse action against Plaintiff after OIA provided a briefing on Plaintiff's ethical failures.  Defendant Manion enlisted the help of Defendant Starr, an HR professional, to carry out the adverse action.  And Defendant Manion informed Defendant Boone of her plan to take the adverse action against plaintiff.  Under

these circumstances, no Defendant's conduct violates clearly-established law.   Further, each Defendant's "actions <u>could reasonably have been</u> thought consistent with the rights they are alleged to have violated." *Anderson*, 483 U.S. at 638 (emphasis added).  The Court should grant summary judgment on the basis of qualified immunity.

**V.     The Court Should Dismiss The Official Capacity Claims Because Plaintiff Failed To Allege That Any Defendant Could Provide The Prospective Relief Sought.**

The Eleventh Amendment bars suits for damages against state actors in their official capacity.[10]  A "suit against a state official in his or her official capacity is not a suit against the official but a suit against the official's office." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989); *see also id.* at 71 n.10 (permitting Section 1983 suits for injunctive relief against state officials in their official capacities).  The ability to comply with injunctive relief would come from a defendant's official capacity, not their individual capacity because it is their office—not their person—that gives them the ability to rectify any wrongful act.  *See Hill v. Shelander*, 924 F.2d 1370, 1374 (7th Cir. 1991) ("injunctive relief against a state official may be recovered only in an official capacity suit").

However, the complaint fails to allege that any Defendant had or has the ability to provide the injunctive relief Plaintiff seeks:  reinstatement.  *See generally* dkt. 1; *see id.* at 5.  The failure to allege <u>the ability</u> to provide injunctive relief is fatal to an official capacity suit.  *See Soloviev v. Goldstein*, 104 F. Supp. 3d 232, 245 (E.D.N.Y. 2015).  The Court should accordingly dismiss the official capacity claim for failure to state a claim.  *See id*; *see also Iqbal*, 556 U.S. at 679 (requiring a plaintiff to plead facts demonstrating entitlement to relief).

---

[10] Defendants' answer asserted a sovereign immunity defense.  Dkt. 17 at ¶34.

Further, none of the Defendants had an official capacity at DTF at any point during the pendency of this suit.  Plaintiff filed this action in August 2019 complaining of events taking place in August 2016.  Dkt. 1.  The evidence demonstrates that each defendant retired from DTF prior to the filing of this suit.  *See* Boone Decl.; Manion Decl.; Starr Decl.  With minimal diligence, Plaintiff could have brough an official capacity suit against the holders of at least some of the Defendants' former offices.  *See* <https://www.tax.ny.gov/about/leadership-team.htm> (identifying the Acting Commissioner and the Executive Deputy Commissioner).  Plaintiff also could have, but did not, bring suit against DTF for injunctive relief.  Yet Plaintiff simply brought suit against the officials who held those positions when DTF terminated her, regardless of their present capacity.

Rule 25 does not provide for automatic substitution in this case.  Automatic substitution of a successor in office occurs when the official capacity defendant "ceases to hold office <u>while the action is pending</u>."  Fed. R. Civ. P. 25(d) (emphasis added).  All Defendants ceased to hold office prior to the commencement of this action.  *See* Dkt. 1; Boone Decl.; Manion Decl.; Starr Decl. Accordingly, the Court should grant summary judgment on the official capacity claim because the evidence demonstrates that no Defendant can provide the injunctive relief sought, and the Eleventh Amendment does not allow for damages against a state employee in her official capacity.

[remainder of page intentionally blank]

**CONCLUSION**

The Court should grant Defendants' motion for summary judgment and dismiss the complaint in its entirety.

Dated: Albany, New York
        July 26, 2022

LETITIA JAMES
Attorney General of the State of New York
Attorney for Defendants
The Capitol
Albany, New York  12224

By: s/ Jonathan S. Reiner
Jonathan S. Reiner
Assistant Attorney General, of Counsel
Bar Roll No. 702645
Telephone: (518) 776-2641
Email: jonathan.reiner@ag.ny.gov

# APPENDIX

# *Caimite v. Rodriguez*

United States District Court for the Northern District of New York

September 23, 2020, Decided; September 23, 2020, Filed

9:17-cv-919 (GLS/CFH)

**Reporter**

2020 U.S. Dist. LEXIS 174205 *; 2020 WL 5651672

ECSON CAIMITE, Plaintiff, v. A. RODRIGUEZ et al., Defendants.

**Prior History:** *Caimite v. Rodriguez, 2020 U.S. Dist. LEXIS 64174 (N.D.N.Y., Apr. 9, 2020)*

**Counsel:** [*1] Ecson Caimite, Plaintiff, Pro se, Coxsackie, NY.

For A. Rodriguez, Acting Director of Special Housing/Inmate Disciplinary Program, NYS DOCCS, J. A. Esgrow, Commissioners Hearing Officer, Southport Correctional Facility, Defendants: Matthew P. Reed, LEAD ATTORNEY, New York State Attorney General - Albany, The Capitol, Albany, NY.

**Judges:** Gary L. Sharpe, United States District Judge.

**Opinion by:** Gary L. Sharpe

# Opinion

## SUMMARY ORDER

On April 9, 2020, Magistrate Judge Christian F. Hummel issued a Report-Recommendation and Order (R&R), which recommends that defendants A. Rodriguez's and J.A. Esgrow's motion for summary judgment be denied. (Dkt. No. 72.) Pending before the court are defendants' objections to the R&R. (Dkt. No. 73.)

Only specific objections warrant de novo review. *See Almonte v. N.Y. State Div. of Parole, No. Civ. 904CV484, 2006 U.S. Dist. LEXIS 2926, 2006 WL 149049, at *3-5 (N.D.N.Y. Jan. 18, 2006).* Objections that are general, conclusory, frivolous, or a mere reiteration of an argument already made to the Magistrate Judge trigger only clear error review. *See 2006 U.S. Dist. LEXIS 2926, [WL] at *4-5.*

Only two of defendants' arguments are arguably specific objections, for which the court has conducted de novo

review. *See 2006 U.S. Dist. LEXIS 2926, [WL] at *3-4.* First, defendants contend that Judge Hummel erred in relying on *Rosales v. Bennett, 297 F. Supp. 2d 637 (W.D.N.Y. 2004)*, and *Sweet v. Wende Corr. Facility, 253 F. Supp. 2d 492 (W.D.N.Y. 2003)*, and concluding that a plaintiff [*2] does not have to specifically raise all issues in a hearing appeal to preserve or exhaust his claims. (Dkt. No. 73 at 4-7.) Second, defendants argue that Judge Hummel erred in relying on *Thomas v. Calero, 824 F. Supp. 2d 488 (S.D.N.Y. 2011)*, and concluding that a triable question of fact exists with regard to whether Rodriguez was personally involved in a constitutional violation, because a review of the record, as well as Rodriguez's declaration, shows that he lacked sufficient personal involvement. (*Id.* at 7-9.)

Having considered the R&R in light of defendants' objections, the court sees no reason to repeat what is said in the R&R in conducting de novo review because this court reaches the same conclusions as those reached by Judge Hummel. (Dkt. No. 72 at 18-26.)

Defendants' remaining arguments are "general, conclusory, perfunctory, [and] a mere reiteration of . . . argument[s] [already] made," which triggers review only for clear error. *See Rahman v. Fischer, No. 9:10-cv-1496, 2014 U.S. Dist. LEXIS 20846, 2014 WL 688980, at *1 (N.D.N.Y. Feb. 20, 2014)* (collecting cases); *Almonte, 2006 U.S. Dist. LEXIS 2926, 2006 WL 149049, at *4* (explaining that resubmitting the same arguments previously made "fails to comply with the specificity requirement").

For instance, defendants contend that Judge Hummel erred in concluding that triable issues of fact exist as to whether Esgrow [*3] violated Caimite's constitutional due process rights because, according to defendants, Judge Hummel "ignore[d] the fact that it is [d]efendants' position that [Caimite] never called J. Webster/the tester as a witness," and "ignore[d] th[e] fact that, . . . [when] asked what witnesses he wanted to call, [Caimite] requested several witnesses, but made no mention of J. Webster or the person who performed the drug testing."

2020 U.S. Dist. LEXIS 174205, *3

(Dkt. No. 73 at 9-10.) However, as the R&R illustrates, the opposite is actually true. Indeed, Judge Hummel specifically addressed, and, after a thorough analysis, rejected, these same arguments. (Dkt. No. 72 at 12-18.)

Lastly, defendants maintain that Judge Hummel erred in concluding that a triable issue of fact exists as to whether defendants are entitled to qualified immunity, and that the court incorrectly concluded this by its "mistaken analysis of [Caimite's] due process claims." (Dkt. No. 73 at 10.) This gripe is entirely conclusory and reiterates a previous argument made by defendants in their motion for summary judgment, and, thus, triggers only clear error review. (Dkt. No. 60, Attach. 10 at 10-11); *see Almonte, 2006 U.S. Dist. LEXIS 2926, 2006 WL 149049, at *4-5*.

After reviewing the R&R, there is no apparent, let alone [*4] clear, error in Judge Hummel's analysis, which squarely addresses defendants' arguments and provides multiple, appropriate reasons for denying defendants' motion for summary judgment. (Dkt. No. 72 at 12-18, 22-23). Accordingly, the R&R, is adopted in its entirety.

Accordingly, it is hereby

**ORDERED** that the Report-Recommendation and Order (Dkt. No. 72) is **ADOPTED** in its entirety; and it is further

**ORDERED** that defendants' motion for summary judgment (Dkt. No. 60) is **DENIED**; and it is further

**ORDERED** that this case is now deemed trial ready and a trial scheduling order will be issued in due course; and it is further

**ORDERED** that the Clerk provide a copy of this Summary Order to the parties.

**IT IS SO ORDERED**.

September 23, 2020

Albany, New York

/s/ Gary L. Sharpe

Gary L. Sharpe

U.S. District Judge

# *Caimite v. Rodriguez*

United States District Court for the Northern District of New York

April 9, 2020, Decided; April 9, 2020, Filed

No. 9:17-CV-0919 (GLS/CFH)

**Reporter**

2020 U.S. Dist. LEXIS 64174 *; 2020 WL 6530780

ECSON CAIMITE, Plaintiff, v. A. RODRIGUEZ; J.A. ESGROW, Defendants.

**Subsequent History:** Adopted by, Summary judgment denied by *Caimite v. Rodriguez, 2020 U.S. Dist. LEXIS 174205 (N.D.N.Y., Sept. 23, 2020)*

**Prior History:** *Caimite v. Venettozzi, 2018 U.S. Dist. LEXIS 185631 (N.D.N.Y., Oct. 29, 2018)*

**Counsel:** [*1] ECSON CAIMITE, Plaintiff, Pro se. Coxsackie, New York.

For Defendants: DENISE P. BUCKLEY, ESQ., Assistant Attorney General, OF COUNSEL, HON. LETITIA JAMES, Attorney General for the State of New York, Assistant Attorney General, Albany, New York.

**Judges:** Christian F. Hummel, United States Magistrate Judge.

**Opinion by:** Christian F. Hummel

# Opinion

### REPORT-RECOMMENDATION AND ORDER[1]

Plaintiff pro se Ecson Caimite ("plaintiff" or "Caimite"), an inmate who was, at all relevant times, in the custody of the New York Department of Corrections and Community Supervision ("DOCCS"), brings this action pursuant to 42 U.S.C. § against Defendants A. Rodriguez ("Defendant" or "Rodriguez") and J.A. Esgrow ("Defendant" or "Esgrow") for violations of his rights under the *Fourteenth Amendment*. Dkt. No. 1 ("Compl."). Presently before the Court is Defendants' motion for summary judgment. Dkt. No. 60. Caimite

opposed the motion, and Defendants submitted a reply. Dkt. Nos. 66, 67, and 70. For the following reasons, it is recommended that Defendants' motion for summary judgment be denied.

## I. BACKGROUND

### A. Procedural History

On August 21, 2017, the Court received the Complaint in the within action. See Compl. Upon review, the Court directed a response to the *Fourteenth Amendment* due process [*2] claims, the *Eighth Amendment* conditions of confinement claims, and the pendent state law claims. Dkt. No. 7. On March 1, 2018, Defendants filed a motion to dismiss pursuant to *Rule 12(b)(6) of the Federal Rules of Civil Procedure* ("Fed. R. Civ. P."). Dkt. No. 19. In a Report-Recommendation and Order filed on October 29, 2018, the Court recommended dismissal of the *Eighth Amendment* conditions of confinement claims and state law claims, but denied the motion with respect to Caimite's *Fourteenth Amendment* claims against Rodriguez and Esgrow in connection with a Tier III hearing concerning a January 2016 misbehavior report.[2] Dkt. No. 28 (the "October 2018 R&R"). On November 20, 2018, the Court adopted the Report-Recommendation and Order in its entirety. Dkt. No. 29.

On June 6, 2019, Caimite appeared at a deposition. Dkt. No. 60-3. On December 4, 2019, Defendants filed the within motion pursuant to *Fed. R. Civ. P. 56* seeking judgment as a matter of law with respect to Caimite's claims. Dkt. Nos. 60, 70 (reply). Caimite opposed the motion. Dkt. Nos. 66, 67.

---

[1] This matter was referred to the undersigned for report and recommendation pursuant to *28 U.S.C. § 636(b)* and **N.D.N.Y. L.R. 72.3(c)**.

[2] In an Order filed on November 20, 2018, the Court adopted the October 2018 Report-Recommendation and Order in its entirety. Dkt. No. 29.

2020 U.S. Dist. LEXIS 64174, *2

**B. Facts**[3]

In support of the motion, Defendants filed a Statement of Material Facts.[4] Dkt. No. 60-9. The facts are reviewed in the light most favorable to Caimite as the non-moving party. See subsection II (A) infra. In January 2016, [*3] Plaintiff was confined at Great Meadow Correctional Facility. See generally, Compl. On January 7, 2016, Corrections Officer Gebo ("C.O. Gebo")[5] issued Caimite a misbehavior report ("January MBR") charging him with possession of contraband, possession of marijuana, and

---

[3] The parties provided exhibits with their submissions, without objection or challenges to the authenticity of any documents. Therefore, to the extent that the "facts" the parties assert are supported by the record, the undersigned will consider the facts and relevant exhibits/documents in the context of the within motion. See *U.S. v. Painting known as Hannibal, No. 07-CV-1511, 2010 U.S. Dist. LEXIS 50483, 2010 WL 2102484, at *1, n.2 (S.D.N.Y. May 18, 2010)* (citing *Daniel v. Unum Provident Corp., 261 F. App'x 316, 319 (2d Cir. 2008)* (summary order) ("[A] party is not required to authenticate documents on a summary judgment motion where, as here, authenticity is not challenged by the other party)). In light of the procedural posture of the case, the following recitation is derived from the record now before the Court, with all inferences drawn and ambiguities resolved in non-moving party's favor. *Terry v. Ashcroft, 336 F.3d 128, 137 (2d Cir. 2003)*.

[4] *N.D.N.Y, Local Rule 7.1(a)(3)* states: `Summary Judgment Motions `Any motion for summary judgment shall contain a Statement of Material Facts. The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established. The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits. `The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute. Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party. `*Local Rule 7.1(a)(3)*.

[5] In a Decision and Order filed on October 25, 2017, the Court found that Plaintiff's claims against Gebo did not survive review pursuant to *28 U.S.C. § 1915(e)(2)(B)* and *28 U.S.C. § 1915A(b)* and dismissed Gebo from the action. See Dkt. No. 7 at 14.

---

smuggling. Dkt. No. 66 at 30.[6] In the January MBR, Gebo stated:

> On the above date and approximate time, Inmate Caimite was returning from the infirmary. Inmate Caimite had requested a medical exam by his provider, PA Nesmith. Inmate Caimite expressed some pain in the lower back area. PA Nesmith ordered x-rays to rule out the possibility of a fracture to the low back. During the x-rays, PA Nesmith observed an unidentifiable foreign object near the inmate's rectal area. Inmate Caimite was then escorted back to B-1. Prior to securing Inmate Caimite in his assigned cell, Sgt. Bascue, who was notified of the foreign object, ordered a strip frisk of Inmate Caimite so that the foreign object could then be identified. Inmate Caimite denied possessing any contraband, but agreed to the strip frisk. During the strip frisk, I observed a torn state issued bed sheet strand that Inmate Caimite had tied around his waist. I was able to untie [*4] the bed sheet, which allowed the torn bed sheet strand to fall to the floor. I then observed several bundles tied to the torn bed sheet which contained unknown objects. I retrieved the torn bed sheet strand and set the item to the side so that I could finish the strip frisk. No further contraband was recovered during the strip frisk. I surrendered the suspected contraband to certified NIK tester CO J. Webster. Officer Webster using NIK Test (E), tested the contents of the bundles. Three of the bundles containing a green leafy substance tested positive for marijuana. Two of the bundles weighed .2 grams and the third bundle weighed .4 grams for a total of .8 grams. At the conclusion of the testing Officer Webster secured the marijuana in a[n] evidence bag and secured the contraband in the secure evidence drop box [. . .] in accordance with Directive 4910(A).

Dkt. No. 66 at 30.

Soon after the January MBR was issued, Caimite was transferred to Southport Correctional Facility ("Southport C.F."). Dkt. No. 60-3 at 31. On January 28, 2016, while Caimite was confined at Southport C.F., a Tier III disciplinary hearing related to the January MBR commenced. Id. at 35. Esgrow presided over the hearing, [*5] which was recorded and transcribed. Dkt. No. 60-4 at ¶¶ 18, 19.

---

[6] Unless otherwise noted, the Court's citations to page numbers refer to the pagination generated by CM/ECF, not the page numbers in the parties' documents.

2020 U.S. Dist. LEXIS 64174, *5

At the commencement of the hearing, Caimite requested documents and time to prepare for the hearing. Dkt. No. 60-5 at 1-13. Esgrow adjourned the hearing until February 8, 2016. Id. at 13. On February 8, 2016, Caimite requested several witnesses including P.A. Smith, the x-ray technician (Karkowski), the escorting officer, Sergeant Bascue, Sergeant Fraser, the hospital porters, and inmates from B-block. Dkt. No. 60-4 at ¶ 20; Dkt. No. 60-5 at 16-17. Esgrow and Caimite discussed potential questions for the aforementioned witnesses. Dkt. No. 60-5 at 15-34. After Sergeant Fraser testified, the hearing was adjourned until February 12, 2016. Id. at 36.

On February 12, 2016, during a discussion regarding the chain of custody, Esgrow directed Caimite's attention to a copy of Form 2080, a Request for Test of Suspected Contraband Drugs. Dkt. No. 60-5 at 38; Dkt. No. 60-11 at 65. Esgrow stated that the document "shows chain of custody from the officer who claims that he collected, the, the evidence to the officer that, according to the documents, tested it" and specifically referenced CO Webster by name. Dkt. No. 60-5 at 38.

After Sergeant Bascue testified, [*6] Caimite and Esgrow engaged in the following colloquy:

ESGROW: . . . Mr. Caimite you had an opportunity to read this two-page extension, is that correct?

CAIMITE: I had the opportunity to read it and I would like a copy.

ESGROW: That request is denied. Any comments on this?

CAIMITE: Yes I would like a copy due to the fact that I would like to investigate and review it, due to the fact that right now, I'm also right now putting together my questioning. Also I'd like to view the video tape of the strip-frisk.

ESGROW: You already watched it.

CAIMITE: I was rushed last time due to limited time. I would like to watch that one more time so I can marshal the facts and prepare my defense.

ESGROW: That request is denied. Anything else?

CAIMITE: I would object to that.

ESGROW: So noted, anything else?

CAIMITE: I also, I also asked for um, witnesses, hospital porters? I have questions for these witnesses right here. I asked for uh, inmates who watched the search of me when I came out of the cell [. . . ]. I have questions for these witnesses. Also, I would like Officer Gebo as a witness.

ESGROW: Yeah, I know. What questions to you have for the hospital porters?

CAIMITE: And also J. Webster.

ESGROW: What questions [*7] do you have for the hospital porters?

Dkt. No. 60-5 at 51-52. Esgrow and Caimite discussed the questions Caimite intended to pose to the hospital porters and inmates and the hearing was adjourned. Dkt. No. 60-5 at 52-57.

On February 25, 2016, Esgrow advised that he was ready to issue a decision and presented Caimite with Form 2176, a two-page document entitled Witness Interview Notice. Dkt. No. 60-5 at 88. The form, which Esgrow prepared, included information related to the following witnesses: Bascue, Fraser, C.O. McCarthy, x-ray technician, Karkowski, C.O. Gebo, C.O. J. Smith, P.A. Nesmith, "all hospital porters," and inmates within B-block. Dkt. No. 60-11 at 10-11. On the form, Esgrow noted that Fraser, Gebo, Bascue, Smith, McCarthy, and Karkowski were called to testify and he provided explanations for denying Caimite's requests for testimony from hospital porters, inmates within B-block, and P.A. Nesmith. Dkt. No. 60-4 at ¶ 37; Dkt. No. 60-11 at 7-8, 10-11. Caimite refused to accept the form and stated, "I'm objecting to witness refuses [sic]." Dkt. No. 60-5 at 88.

Esgrow read the disposition into the record. Dkt. No. 60-4 at ¶ 18; Dkt. No. 60-5 at 88. Esgrow found Caimite guilty [*8] of all charges, and sentenced him to 240 days in the Special Housing Unit ("SHU"). Dkt. No. 60-11 at 3. Caimite refused to sign the disposition and requested an appeals form. Dkt. No. 60-5 at 91; Dkt. No. 60-11 at 6. When Caimite began to voice his objections, Esgrow stated, "[y]ou need to make these objections in writing. Here is your copy of your disposition. Id. at 92. Caimite continued, "I object the hearing officer never allowed me, never allowed witness to, the tester." Id. Esgrow responded, "You didn't request a tester. You need to make these objections in writing." Id.

On March 8, 2016, Caimite appealed the disciplinary disposition. Dkt. No. 60-7 at 3-6; Dkt. No. 66 at 22. In the appeal, Caimite argued that (1) the strip frisk was unlawful; (2) he was not timely served with the January MBR; (3) Esgrow failed to comply with the 24-hour deadline for rendering his determination and failed to serve a written disposition on Caimite; (4) Esgrow denied Plaintiff's request to telephone his attorney during the hearing; (5) Esgrow "continuously interfered with witness questioning," "disallowed pertinent material questions," led witnesses, and was "caught red handed sneaking and filling out parts [*9] of disposition forms before Caimite even finished questioning witnesses;"

and (6) Esgrow wrongfully refused to allow Plaintiff to call Nesmith, hospital porters, and inmates. Dkt. No. 60-7 at 3-6.

On March 11, 2016, the Office of Special Housing and Inmate Disciplinary Programs received Caimite's appeal. Dkt. No. 60-6 at ¶ 16; Dkt. No. 60-9 at ¶ 12. On March 14, 2016, Caimite's sentence was modified and reduced to 140 days, with 40 days suspended. Compl. at ¶ 39.

In May 2016, the Office of Special Housing and Inmate Disciplinary Programs received a "Supplemental Appeal" from Prisoners' Legal Services, on behalf of Caimite. Dkt. No. 66 at 22-24. On July 20, 2016, Caimite filed a proceeding in state court pursuant to *CPLR Article 78,* challenging the disposition. Dkt. No. 60-3 at 70-71; *Caimite v. Annucci, 155 A.D.3d 1171, 62 N.Y.S.3d 822 (N.Y. App. Div. 2017).* During the pendency of that action, Caimite served his SHU sentence. Compl. at ¶ 40. On or about December 11, 2016, Caimite was released from the SHU. Id.

On June 27, 2017, while the Article 78 petition was pending, Rodriguez, Assistant Director of the Office of Special Housing and Inmate Disciplinary Programs, informed Superintendent Joseph H. Noeth that the disciplinary determination was reversed "based on a recommendation [*10] from the NYS Attorney General's Office." Compl. at ¶ 41; Dkt. No. 66 at 16.

## II. DISCUSSION

Defendants contend that Caimite's *Fourteenth Amendment* claims lack merit and further, that Rodriguez was not personally involved in any *Fourteenth Amendment* violations. Dkt. No. 60. Alternatively, Defendants argue that they are entitled to qualified immunity. Defendants also argue that Caimite failed to exhaust his administrative remedies.[7] See id.

## A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact, it was supported by affidavits or other suitable evidence, and the moving party is entitled to judgment as a matter of

law. The moving party bears the burden of demonstrating the absence of disputed material facts by providing the court with portions of pleadings, depositions, and affidavits which support the motion. *Fed. R. Civ. P. 56*; *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).* Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).* All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. *Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).*

The party opposing the motion must set forth facts showing a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).* For a court to grant a motion for summary judgment, it must be [*11] apparent that no rational finder of fact could find in favor of the non-moving party. *Gallo v. Prudential Residential Servs., Ltd. Partnership, 22 F.3d 1219, 1223-24 (2d Cir. 1994)*; *Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1988).*

Where, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. See *Triestman v. Federal Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006).* As the Second Circuit has stated,

[t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," . . . that a pro se litigant's submissions must be construed "liberally,". . . and that such submissions must be read to raise the strongest arguments that they "suggest," . . . . At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, . . . or arguments that the submissions themselves do not "suggest," . . . that we should not "excuse frivolous or vexatious filings by pro se litigants," . . . and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law.

Id. (citations and footnote omitted); see also *Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191-92 (2d Cir. 2008)* ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds pro se, ... a court is obliged to construe his pleadings liberally.'" [*12] (citations omitted)). However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly

---

[7] In their Answer, Defendants pleaded, inter alia, the affirmative defense that Caimite failed to exhaust his administrative remedies. Dkt. No. 32 at ¶ 16.

supported motion; the requirement is that there be no genuine issue of material fact. *Anderson, 477 U.S. at 247-48*.

## B. *Fourteenth Amendment*

Caimite claims that Esgrow violated his right to procedural due process by refusing to call J. Webster as a witness without justification supported by institutional need. See generally Compl. Caimite also contends that Rodriguez violated his due process rights in connection with the disciplinary disposition on appeal. See id.

The *Due Process Clause of the Fourteenth Amendment* states: "[n]o State shall . . . deprive any person of life, liberty, or property without due process of law." U.S. CONST. AMEND. XIV § 1. To set forth a prima facie due process claim, "a plaintiff must establish (1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process." *Giano v. Selsky, 238 F.3d 223, 225 (2d Cir. 2001)* (citation and quotation marks omitted); see *Mitchell v. Keane, 974 F.Supp. 332, 342 (S.D.N.Y. 1997)* ("To state a procedural due process claim challenging a disciplinary action, a prisoner must allege both that he was deprived of a liberty interest cognizable under the *Due Process Clause*, and that he was deprived of that interest without the requisite [procedural due] process.") (emphasis [*13] added).

## 1. Liberty Interest

An inmate has a protected liberty interest in being free from segregated confinement but only where the alleged deprivation imposed amounts to an "atypical and significant hardship in relation to the ordinary incidents of prison life." *Sandin v. Conner, 515 U.S. 472, 483-84, 115 S. Ct. 2293, 132 L. Ed. 2d 418 (1995)*. "Factors relevant to determining whether the plaintiff endured an 'atypical and significant hardship' include 'the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions' and 'the duration of the disciplinary segregation imposed compared to discretionary confinement.'" *Davis v. Barrett, 576 F.3d 129, 133 (2d Cir. 2009)* (quoting *Sandin, 515 U.S. at 484*). Although not dispositive, the duration of a disciplinary confinement is significant in determining atypicality. *Colon v. Howard, 215 F.3d 227, 231 (2d Cir. 2000)* (citations omitted). No firmly established, bright-line rule exists to determine the length or type of sanction that rises to the level of

atypical and significant hardship. *Wilkinson v. Austin, 545 U.S. 209, 223, 125 S. Ct. 2384, 162 L. Ed. 2d 174 (2005)* (citations omitted). Instead, the Second Circuit has provided a general guideline: "[w]here the plaintiff was confined for an intermediate duration—between 101 and 305 days—'development of a detailed record' of the conditions of confinement relative to ordinary prison conditions is required." *Palmer v. Richards, 364 F.3d 60, 64-65 (2d Cir. 2004)* (quoting *Colon, 215 F.3d at 232*). In the [*14] absence of a dispute about the conditions of confinement, summary judgment may be issued "as a matter of law." *Id. at 65* (citations omitted).

After the Tier III disciplinary hearing, Caimite was sentenced to 240 days in SHU confinement. See Dkt. No. 60-11 at 3. Caimite was also penalized with a loss of commissary, telephone privileges, and packages. See id. The sentence was modified to 140 days, with 40 days suspended. See Dkt. No. 60-3 at 37. During his deposition, Caimite described the conditions he endured while confined in the SHU. Caimite testified that the vents in the SHU were clogged, causing a foul smell, that SHU inmates "scream[ed] all day long," and that inmates threw feces and urine. Dkt. No. 60-3 at 45-46.

For the purposes of this motion, defendants do not argue that Caimite's SHU confinement did not constitute a deprivation of a cognizable liberty interest. See Dkt. No. 60-10 at 8-10; Dkt. No. 70 at 4-6.

## 2. Procedural Due Process

Caimite contends that he was deprived of the opportunity to call J. Webster as a witness and that Esgrow failed to provide an explanation for denying the witness. See Dkt. No. 66 at 7. Defendants argue that Caimite was afforded ample due process. The due [*15] process protections afforded an inmate do not equate to "'the full panoply of rights' due to a defendant in a criminal prosecution." *Sira v. Morton, 380 F.3d 57, 69 (2d Cir. 2004)* (quotation omitted).

> Nevertheless, an inmate is entitled to advance written notice of the charges against him; a hearing affording him a reasonable opportunity to call witnesses and present documentary evidence; a fair and impartial hearing officer; and a written statement of the disposition, including the evidence relied upon and the reasons for the disciplinary actions taken.

Id. (citing *Wolff v. McDonnell, 418 U.S. 539, 563-67, 94 S. Ct. 2963, 41 L. Ed. 2d 935 (1974))*.

2020 U.S. Dist. LEXIS 64174, *15

An accused prisoner has the right to a hearing where he is given the reasonable opportunity to call witnesses and present documentary evidence. See *Sira, 380 F.3d at 69*. "It is well settled that an official may refuse to call witnesses as long as the refusal is justifiable [such as] . . . on the basis of irrelevance or lack of necessity." *Scott v. Kelly, 962 F.2d 145, 146-47 (2d Cir.1992)* (quoting *Kingsley v. Bureau of Prisons, 937 F.2d 26, 30 (2d Cir.1991))*. The right to call witnesses "is not unfettered . . . [and] may be limited for security reasons, to keep a hearing within reasonable limits, or on the basis of irrelevance of lack of necessity." *Brooks v. Rock, No. 9:11-CV-1171 (GLS/ATB), 2014 U.S. Dist. LEXIS 43848, 2014 WL 1292232, at *28 (N.D.N.Y. Mar. 28, 2014)* (citations omitted); *Richard v. Fischer, 38 F. Supp.3d 340, 359 (W.D.N.Y. 2014)* (citation omitted) ("While inmates are entitled to call witnesses at disciplinary hearings, hearing [*16] officers may deny witness testimony as irrelevant or redundant.").

The Second Circuit has held that it is the prison official's burden to establish the rationality of declining an inmate's witness request. See *Kingsley, 937 F.2d at 30*. To satisfy this burden, the prison official must provide "some explanation" during or after the hearing as to why he or she declined the witness. See *Russell v. Selsky, 35 F.3d 55, 58 (2d Cir. 1994)*. "While prison officials need not put their reasons for refusing the inmate's request in writing or into the administrative record of the disciplinary hearing, due process does require that prison officials 'at some point' state their reasons for refusing the inmate's request." *Gonzalez v. Chalk, No. 13 Civ. 5486, 2014 U.S. Dist. LEXIS 44762, 2014 WL 1316557, at *5 (S.D.N.Y. Apr. 1, 2014)* (citing *Ponte v. Real, 471 U.S. 491, 492, 105 S. Ct. 2192, 85 L. Ed. 2d 553 (1985))*.

As discussed supra, Defendants previously moved for dismissal of Caimite's *Fourteenth Amendment* due process claim, arguing that Caimite failed to state a claim against Esgrow based upon Esgrow's denial of J. Webster as a witness. See generally, Dkt. No. 19. In the October 2018 R&R, which was affirmed by the Court, the undersigned denied Defendants' motion and reasoned:

. . . as to H.O. Esgrow's denial of J. Webster, there is no indication in the pleadings that H.O. Esgrow offered "some explanation" as to why he denied the witness, as is required under the *Fourteenth Amendment*. See *Gonzalez, 2014 U.S. Dist. LEXIS 44762, 2014 WL 1316557, at *5*; [*17] see *Lebron v. Artus, No. 06-CV-0532(VEB), 2008 U.S. Dist.*

*LEXIS 1666, 2008 WL 111194, at *10 (W.D.N.Y. Jan. 9, 2008)* ("When an inmate is precluded from obtaining certain witness testimony or other evidence, due process requires that the inmate be provided reasons for the denial either at the disciplinary hearing or at a later time") (citation omitted). Although defendants argue that the testimony J. Webster would have provided regarding the "green leafy substance" found in plaintiff's rectum was ultimately presented to H.O. Esgrow in written reports, due process requires that the hearing officer inform plaintiff why he denied a witness. See *Russell, 35 F.3d at 58*; *Gonzalez, 2014 U.S. Dist. LEXIS 44762, 2014 WL 1316557, at *5*. Thus, H.O. Esgrow's refusal to call the individual who conducted the drug test on the foreign object found in plaintiff's rectum, "without any justification supported by institutional need, may well constitute a violation of [plaintiff's] due process rights." *Sowell v. Bullis, No. 9:13-CV-1482 (GLS/DJS), 2016 U.S. Dist. LEXIS 40453, 2016 WL 1696454, at *12 (N.D.N.Y. Mar. 25, 2016)*.

*Caimite v. Venettozzi, No. 9:17-CV-0919 (GLS/CFH), 2018 U.S. Dist. LEXIS 185631, 2018 WL 6069458, at *7 (N.D.N.Y. Oct. 29, 2018)*, Report-Recommendation & Order adopted, *2018 U.S. Dist. LEXIS 197502, 2018 WL 6068414 (N.D.N.Y. Nov. 20, 2018)*.[8]

Now, Defendants move for summary judgment on the same issue, arguing that Caimite never "actually requested" J. Webster or the person who performed the drug testing during the Tier III hearing. Dkt. No. 70 at 6. As Defendants do not acknowledge in their memorandum of law in support of their [*18] motion for summary judgment Caimite's request for J. Webster's testimony during the hearing, it necessarily follows that Defendants have not provided the Court with evidence explaining Esgrow's reasons for refusing to allow J. Webster to testify at the hearing. In support of the motion, Defendants provided copies of the Witness Interview Notice and Hearing Record Sheet. Both documents lack any reference to J. Webster and/or the person who performed the subject testing. Dkt. No. 60-4 at ¶ 32, 39. Defendants argue that, "[h]ad plaintiff requested as a witness J. Webster and/or the person who performed drug testing on the subject contraband, [Esgrow] would have listed this request" in the Hearing

---

[8] The Court has not provided copies of the cases cited within this excerpt from the October 2018 Report-Recommendation & Order or the Report-Recommendation & Order itself, as those were already provided to plaintiff in October 2018.

Record Sheet and the Witness Interview Notice. Id. at ¶¶ 33, 40.

In further support of the motion, Esgrow provided a declaration and avers, "the transcript does not indicate that plaintiff ever requested a person by the name of 'J. Webster' or the individual who conducted the drug test on the suspected contraband that was retrieved from plaintiff during the strip frisk." Dkt. No. 60-4 at ¶ 21. Esgrow continues, "at no point did plaintiff request that J. Webster or the person who performed drug [*19] testing on the suspected contraband, be called as a witness." Id. at ¶¶ 23, 25. Defendants' conclusory assertions are not supported by the evidence. Indeed, a review of the hearing transcript belies Defendants' claims here.

During the hearing, Esgrow provided Caimite with a copy of the Request for Test of Suspected Contraband and Drugs which documented that Gebo transferred the subject substance to J. Webster on January 7, 2016 at 9:05 A.M. and subsequently, at 11:30 A.M., Webster transferred the substance to the "contraband drop box." Dkt. No. 60-11 at 65. Caimite reviewed the document and requested evidence "to see how the chain of custody was handled." Dkt. No. 60-3 at 60; Dkt. No. 60-5 at 38. Esgrow responded, "[w]ell you have the document that shows the chain of custody from the officer who claims that he collected the, the evidence to the officer that, according to the documents, tested it." Dkt. No. 60-5 at 38.

Later the same day, Esgrow and Caimite engaged in the following colloquy:

> CAIMITE: I also, I also asked for um, witnesses, hospital porters? I have questions for these witnesses right here. I asked for uh, inmates who watched the search of me when I came out of the cell [*20] [ . . . ]. I have questions for these witnesses. Also, I would like Officer Gebo as a witness.
> ESGROW: Yeah, I know. What questions to you have for the hospital porters?
> CAIMITE: And also J. Webster.
> ESGROW: What questions do you have for the hospital porters?

Dkt. No. 60-5 at 51-52.

At that time, there was no further discussion related to J. Webster. See id. Caimite was not given the opportunity to inform Esgrow what he hoped J. Webster's testimony would reveal. Although Caimite and Esgrow discussed proposed questions for the hospital porters and inmates,

Esgrow never asked Caimite why J. Webster's testimony was necessary or what questions Caimite intended to ask of J. Webster. Esgrow seems to have ignored the reference entirely, either intentionally or unintentionally. Id.

During his deposition in this case, Caimite claimed that the drugs were "planted" on him. Dkt. No. 60-3 at 69. Caimite explained that if J. Webster were called to testify, Caimite would have presented questions related to the chain of custody and testing procedures. Id. at 61-65. Specifically, Caimite would have posed questions concerning where Webster put the drugs after he conducted testing and Webster's involvement with the misbehavior [*21] report. Id. at 65-66.

On February 25, 2016, Esgrow attempted to obtain Caimite's signature on the Witness Interview Notice form. Dkt. No. 60-5 at 88. Esgrow acknowledges that the form does not include any reference to J. Webster and/or the person who performed drug testing on the suspected contraband. Dkt. No. 60-4 at ¶¶ 35-39. Caimite refused to execute the document. Dkt. No. 60-5 at 88. Esgrow then read the disposition into the record. Dkt. No. 60-5 at 89-92. As Caimite began to object, Esgrow informed Caimite that he had to make his objections in writing. Id. at 92. Caimite stated, "I object the hearing officer never allowed me, never allowed witness to, the tester." Id. Esgrow responded, "You didn't request a tester. You need to make these objections in writing." Dkt. No. 60-5 at 92.

In the memorandum of law in support of the motion to dismiss, Defendants argue that Plaintiff did not request J. Webster or the individual who conducted the drug test, as a witness during the hearing. Dkt. No. 60-10 at 5, 8, 10. In their Reply memorandum, Defendants concede that the hearing transcript "reflects one reference to J. Webster and one reference to 'the tester[,]'" but claim that Caimite's reference to Webster [*22] was "out of context" and continued to maintain that "the dialogue reflected in the transcript does not indicate that the Hearing Officer ever was made aware of a request by plaintiff for this person to testify." See Dkt. No. 70 at 4, 6, n. 4.

The issue of whether Esgrow ignored Caimite's request for J. Webster to testify or whether Caimite's reference to J. Webster was "confusing" and/or "seemingly out of context" to Esgrow cannot be decided on a motion for summary judgment as there are material questions of fact in dispute. The hearing was conducted over the course of approximately one month. See generally Dkt.

No. 60-5. The transcript of the hearing, which is over ninety pages in length, contains gaps for adjournments and interruptions when the recording was paused or "turned off." See id. at 9, 11, 13, 26, 29, 34,35, 36, 37, 41, 50, 51, 57, 58, 63, 64, 71, 78, 80, 87, 88. It is unclear what, if any conversations, occurred off the record. The competing evidence rests on the credibility of Caimite on the one hand and Esgrow on the other. In these circumstances, the governing law that the evidence must be viewed in the light most favorable to the non-moving party directs the Court to credit Caimite's version of events for purposes of this motion. See In re Dana Corp., 574 F.3d 129, 152 (2d. Cir. 2009) (holding that a [*23] court faced with a motion for summary judgment must draw all reasonable inferences in favor of the non-moving party and may not make credibility determinations or weigh the evidence, functions which are reserved to a jury and not a judge) (citing cases).

Having thoroughly reviewed the hearing transcript and record, the Court finds that there are issues of fact related to Esgrow's actions and whether the disciplinary hearing comported with the constitutional due process protections that must be afforded to an inmate's disciplinary proceedings. Because the Court has not been provided with any evidence related to Esgrow's reasons for denying Caimite's request to call J. Webster or "the tester" as a witness, the Court "cannot presume any valid reason, either related to personal safety, irrelevance or waste of time." Thomas v. Calero, 824 F. Supp.2d 488, 502 (S.D.N.Y. 2011). Thus, it is recommended that defendants' motion be denied on this ground.

## C. Personal Involvement

Defendants argue that Rodriguez was not personally involved in any constitutional violation. See Dkt. No. 60-10 at 10-12; Dkt. No. 70 at 6-7. "[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (quoting [*24] Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir. 1991)). Thus, supervisory officials may not be held liable merely because they held a position of authority. Id.; Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996). However, supervisory personnel may be considered "personally involved" if:

(1) [T]he defendant participated directly in the alleged constitutional violation;
(2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;
(3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;
(4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or
(5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (citing Williams v. Smith, 781 F.2d 319, 323-24 (2d Cir. 1986)).[9] Assertions of personal involvement that are merely speculative are insufficient to establish a triable issue of fact. See, e.g., Brown v. Artus, 647 F. Supp. 2d 190, 200 (N.D.N.Y. 2009).

"In general, the mere fact that a supervisory official affirmed the result of a disciplinary hearing will not suffice to establish that official's personal involvement in an alleged constitutional [*25] violation, which is a prerequisite to liability under § 1983." Collins v. Ferguson, 804 F. Supp.2d 134, 140 (W.D.N.Y. 2011). However, it is well-settled that a supervisor may be held liable if he or she "proactively participated in reviewing the administrative appeals as opposed to merely rubber-stamping the results." Whitley v. Miller, 57 F.Supp.3d 152, 161 (N.D.N.Y. 2014) (citation omitted). In Whitley, the Court held that a modification of the plaintiff's sentence and a "typewritten form response" which stated that "there were not sufficient grounds to reconsider the previous decision on that hearing," "do not constitute sufficient evidence that either defendant proactively participated in reviewing the merits of [the plaintiff's] claim or had otherwise 'actively considered the issues raised by [plaintiff] in reviewing and

_____

[9] Various courts in the Second Circuit have postulated how, if at all, the Iqbal decision has affected the five Colon factors which were traditionally used to determine personal involvement. Pearce v. Estate of Longo, 766 F.Supp.2d 367, 376 (N.D.N.Y. 2011), rev'd in part on other grounds sub nom., Pearce v. Labella, 473 F. App'x 16 (2d Cir. 2012) (recognizing that several district courts in the Second Circuit have debated Iqbal's impact on the five Colon factors); Kleehammer v. Monroe Cnty., 743 F.Supp.2d 175, 182 (W.D.N.Y.2010) (holding that "[o]nly the first and part of the third Colon categories pass Iqbal's muster . . . ."); D'Olimpio v. Crisafi, 718 F.Supp.2d 340, 347 (S.D.N.Y. 2010) (disagreeing that Iqbal eliminated Colon's personal involvement standard).

responding to [his] appeal[s]' to give rise to a question of fact regarding either individual's personal involvement." *Id. at 162*.

Caimite claims that Rodriguez violated his *Fourteenth Amendment* rights by denying his appeal and failed to remedy the alleged constitutional violations. See Dkt. No. 66 at 9. Rodriguez argues that his involvement was limited to applying the Attorney General's recommendation and constituted no more than a "form response." Dkt. No. 70 at 6-7. Thus, Defendants argue that Rodriguez had [*26] no more personal involvement in the determination than the defendants in Whitley. Id. at 7.

During his deposition, Caimite testified that Venettozzi, the Director of Special Housing, designated Rodriguez to respond to Caimite's March 8, 2016 letter. See Dkt. No. 60-3 at 96. Caimite further claims that, initially, Rodriguez upheld Esgrow's determination. Id. at 91; Dkt. No. 66 at 9. Caimite also contends that, on or around April 2016, Prisoner Legal Services filed a request for "reconsideration" on Caimite's behalf, which resulted in Rodriguez modifying the penalty. Dkt. No. 66 at 9, 22-24; Dkt. No. 60-3 at 91, 95-96.

In support of the motion, Rodriguez submitted a declaration and avers that, "[a]t some point after our office received plaintiff's appeal, we received a recommendation from the NYS Attorney General's Office to reverse the Tier III hearing outcome." Dkt. No. 60-6 at ¶ 21. Rodriguez states that he had no involvement in the Attorney General's decision and that his involvement was limited to applying the recommendation. Id. at ¶¶ 23-24. In support of the motion, Defendants provided a copy of Rodriguez's June 2017 memorandum to Noeth reversing and expunging Esgrow's determination, "based on a recommendation [*27] from the NYS Attorney General's Office." Dkt. No. 60-8 at 3-4.

Notably absent from Rodriguez's declaration is any reference to the initial decision to affirm Esgrow's determination or the decision to modify the sentence. Indeed, Rodriguez does not confirm or deny his involvement in either of those decisions, and Defendants have not provided any other supporting affidavit or documents to suggest that anyone other than Rodriguez proactively reviewed Caimite's appeals.

Although the Court agrees that Rodriguez's application of the Attorney General's recommendation may not constitute personal involvement alone, the Court cannot end the inquiry there. As a factual dispute exists as to

whether Rodriguez proactively participated in the decision-making process as it relates to the initial affirmation and/or modification of the sentence, the Court cannot conclude as a matter of law that Rodriguez was not personally involved in any constitutional deprivation. In *Thomas*, the Court noted that "[w]e believe that, as a matter of pleading, [the Director's] actions, by affirming [the hearing officer's] determination with only a modification of the penalty, are sufficient to demonstrate personal involvement [*28] and could lead a trier of fact to impose liability under the second *Colon* factor." *Thomas, 824 F. Supp. 2d at 509*. Thus, the Court finds that an issue of fact exists with respect to Rodriguez's involvement in various stages of the appellate process and his personal involvement in the alleged constitutional violations. See *Celotex Corp., 477 U.S. at 323*. Accordingly, it is recommended that Defendants' motion be denied on this ground.

### D. Qualified Immunity

Defendants contend that, in the event that the Court finds that Caimite has raised a genuine issue of material fact as to his due process claims, they are entitled to qualified immunity. Dkt. No. 60-10 at 12-13; Dkt. No. 70 at 7-8. Qualified immunity generally protects government officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)*; *Aiken v. Nixon, 236 F.Supp.2d 211, 229-30 (N.D.N.Y. 2002)* (McAvoy, J.), aff'd *80 F. App'x 146 (2d Cir. 2003)*. However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights, qualified . . . immunity might still be available . . . if it was objectively reasonable for the public official to believe that his acts did not violate those [*29] rights." *Kaminsky v. Rosenblum, 929 F.2d 922, 925 (2d Cir. 1991)* (citing *Magnotti v. Kuntz, 918 F.2d 364, 367 (2d Cir. 1990))* (additional citation omitted). A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation. *Pearson v. Callahan, 555 U.S. 223, 232, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009)*. Only if there is a constitutional violation does a court proceed to determine whether constitutional rights were clearly established at the time of the alleged violation. *Id. at 236*.

It is well-settled that during the relevant time period, the

*Fourteenth Amendment* protected an inmate's right to procedural due process and specifically, the right to call witnesses at his disciplinary hearing. *Wolff v. McDonnell, 418 U.S. 539, 555, 94 S. Ct. 2963, 41 L. Ed. 2d 935 (1974).* Here, Defendants have not submitted competent evidence establishing that they "had an objectively reasonable basis for believing their actions did not violate this clearly established right." *Joyner v. Coughlin, No. 92 CIV 7613, 1993 U.S. Dist. LEXIS 3744, 1993 WL 97224, at *4 (S.D.N.Y. Mar. 26, 1993)* (finding that the defendants did not demonstrate that they may be entitled to qualified immunity on the plaintiff's *Fourteenth Amendment* claim based upon his request to call witnesses). Thus, because a reasonable jury could conceivably accept Caimite's claims, Defendants are not entitled to qualified immunity in this case for the alleged *Fourteenth Amendment* violations. Accordingly, it is recommended that Defendants' motion be denied on this ground.

## E. Exhaustion

The PLRA requires that a prisoner [*30] exhaust any administrative remedies available to him or her before bringing an action for claims arising out of his or her incarceration. *Porter v. Nussle, 534 U.S. 516, 524, 122 S. Ct. 983, 152 L. Ed. 2d 12 (2002);* see also *Woodford v. Ngo, 548 U.S. 81, 82, 126 S. Ct. 2378, 165 L. Ed. 2d 368 (2006).* The exhaustion requirement applies "to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter, 534 U.S. at 532.* Further, the exhaustion requirement applies even where the prisoner seeks relief not available in the administrative grievance process, such as monetary damages. *Id. at 524.* To exhaust administrative remedies, the inmate must complete the full administrative review process set forth in the rules applicable to the correctional facility in which he or she is incarcerated. *Jones v. Bock, 549 U.S. 199, 218, 127 S. Ct. 910, 166 L. Ed. 2d 798 (2007)* (internal citation omitted).

At all relevant times, DOCCS had in place a three-step inmate grievance program. *N.Y. Comp. Codes R. & Regs. tit. 7, § 701.5.* DOCCS also had a separate administrative appeal process for disciplinary hearings under *7 NYCRR § 254.8.* For Tier III hearings, such as the hearing at issue in this case, an inmate must appeal to the DOCCS Commissioner or his designee within thirty days of receipt of the disposition. Id. An inmate's appeal of a disciplinary hearing determination

"constitutes exhaustion under the PLRA [*31] for purposes of rendering his due process claim ripe for adjudication in federal court." *Davis v. Barrett, 576 F.3d 129, 132 (2d Cir. 2009).* Additionally, "[c]ourts have held that an Article 78 proceeding 'constitutes a wholly adequate post-deprivation hearing for due process purposes.'" *Marrone v. Cassel, No. 16-CV-4733, 2018 U.S. Dist. LEXIS 149320, 2018 WL 4189518, at *6 (S.D.N.Y. Aug. 31, 2018);* *Kimbrough v. Fischer, No. 9:13-CV-0100 (FJS/TWD), 2014 U.S. Dist. LEXIS 185284, 2014 WL 12684106, at *6 (N.D.N.Y. Sept. 29, 2014)* (finding that the plaintiff properly exhausted his due process claim by pursuing an appeal of the disciplinary conviction and receiving a final decision).

Caimite's challenge to Esgrow's conduct during the disciplinary hearing is "properly the subject of an appeal of the hearing[.]" *Davis v. Barrett, 576 F.3d 129, 132 (2d Cir. 2009);* see also *Rivera v. Goord, 253 F. Supp.2d 735, 750 (S.D.N.Y. 2003)* (concluding that the hearing officer's conduct in a disciplinary hearing was properly the subject of an appeal of the hearing); see also *Flanagan v. Maly, 99 CIV 12336, 2002 U.S. Dist. LEXIS 1373, 2002 WL 122921, at *2 (S.D.N.Y. Jan. 29, 2002)* ("When an inmate challenges the procedure at a disciplinary hearing that resulted in punishment, he exhausts administrative remedies by presenting his objections in the administrative appeals process, not by filing a separate grievance instead of or in addition to his ordinary appeal.").

It is undisputed that Caimite filed an appeal of the Tier III disciplinary determination and an Article 78 proceeding. See *Caimite v. Annucci, 155 A.D.3d 1171, 1172, 62 N.Y.S.3d 822 (N.Y. App. Div. 2017).* However, Defendants argue that Caimite failed [*32] to exhaust his administrative remedies because Caimite failed to mention J. Webster in his appeal of the disciplinary determination. See Dkt. No. 60-10 at 8; Dkt. No. 70 at 3-4. In his appeal, Caimite argued, inter alia, that Esgrow improperly denied his request to call several witnesses including Nesmith; all hospital porters; and inmates in cells B-1-15, B-1-6, B-1-7, B-1-8, and B-1-14. Dkt. No. 60-7 at 3-6. Caimite concedes that he did not write "J. Webster's name along with the several witnesses Hearing Officer J. Esgrow refused to allow to testify without justification supported by institutional need," but argues that he properly preserved the issue on appeal because his request for J. Webster's testimony was documented in the hearing transcript. See Dkt. No. 66 at 13. As discussed supra, a review of the hearing transcript reveals that on February 12, 2016, Caimite referenced J. Webster as a potential witness, and, at the

conclusion of the hearing, Caimite objected to Esgrow's failure to call "the tester." Dkt. No. 60-5 at 52, 92.

Defendants' memoranda fail to cite any case law supporting the argument that Plaintiff must specifically raise all issues in a hearing appeal to preserve [*33] or exhaust his claims. Affording Plaintiff special solicitude as a pro se plaintiff, the Court finds that material issues of fact exist as to whether Defendants were on notice of Caimite's potential claims in subsequent litigation where, as here, plaintiff appears to have raised the argument at the hearing level and, at the appeals level, although not identifying the specific witness, made other arguments relating to the ability to call other witnesses. See *Phillips v. Lecuyer, No. 9:08-CV-878 (FJS/ATB), 2013 U.S. Dist. LEXIS 36452, 2013 WL 1024667, at *12 (N.D.N.Y. Feb. 19, 2013)* ("[I]n order to exhaust a due process claim with respect to a disciplinary hearing, [an inmate's] administrative appeal must specify the alleged misconduct of the hearing officer with sufficient particularity to satisfy 'the purposes of the exhaustion requirement of *§ 1997a(e)*, by giving the state an opportunity to correct any errors and avoiding premature federal litigation.'") (collecting cases); but see *Rosales v. Bennett, 297 F. Supp.2d 637, 641 (W.D.N.Y. 2004)* (finding that the plaintiff exhausted his administrative remedies because his appeal included explicit notice that the inmate was objecting that the hearing officer was not fair and impartial); see also *Sweet v. Wende Corr. Facility, 253 F. Supp.2d 492, 496 (W.D.N.Y. 2003)* (reasoning that because the plaintiff appealed directly from the outcome of the disciplinary hearing, [*34] and raised the issue of the insufficiency of the evidence on appeal, he may have exhausted his administrative remedies). Accordingly, it is recommended that Defendants' motion for summary judgment, insofar as it raises the affirmative defense of failure to exhaust, be denied.

## III. CONCLUSION

**WHEREFORE**, based on the findings set forth above, it is hereby:

**RECOMMENDED**, that Defendants' motion for summary judgment (Dkt. No. 60) be **DENIED**; and it is

**ORDERED**, that copies of this Report-Recommendation and Order be served on the parties in accordance with the Local Rules.

**IT IS SO ORDERED**.

Pursuant to *28 U.S.C. § 636(b)(1)*, parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court "within fourteen (14) days after being served with a copy of the . . . recommendation." *N.Y.N.D. L.R. 72.1(c)* (citing *28 U.S.C. § 636(b)(1)(B)-(C)*). FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993)*; *Small v. Sec'y of HHS, 892 F.2d 15 (2d Cir. 1989)*; *28 U.S.C. § 636(b)(1)*; *Fed. R. Civ. P. 72*, *6(a)*, *6(e)*.[10]

Dated: April 9, 2020

Albany, New York

/s/ Christian F. Hummel

Christian F. Hummel

U.S. Magistrate Jugde

---

**End of Document**

---

[10] If you are proceeding pro se and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order was mailed to you to serve and file objections. *Fed. R. Civ. P. 6(d)*. If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Id. *§ 6(a)(1)(C)*.

## *Washington v. Piper*

United States District Court for the Southern District of New York

November 26, 2019, Decided; November 26, 2019, Filed

18 CV 7783 (NSR)

**Reporter**
2019 U.S. Dist. LEXIS 206338 *

KENNETH ERIC WASHINGTON, Plaintiff, -against- C.O. L. PIPER; SHERIFF CARL E. DUBOIS, Defendants.

**Counsel:** [*1] Kenneth Eric Washington, Plaintiff, Pro se, Goshen, NY.

For Carl E. DuBois, Piper L., Officer, Defendants: Karen D. Edelman-Reyes, New York County District Attorney's Office, New York, NY.

**Judges:** NELSON S. ROMÁN, United State District Judge.

**Opinion by:** NELSON S. ROMÁN

# Opinion

OPINION & ORDER

NELSON S. ROMÁN, United State District Judge

*Pro se* inmate Plaintiff Kenneth Eric Washington ("Plaintiff") commenced the instant action on August 23, 2018 asserting *42 U.S.C. § 1983* ("*Section 1983*") claims against Defendants. (ECF No. 2). In his Complaint, Plaintiff alleges Defendants violated his *Eighth Amendment* rights against cruel and unusual punishment. Plaintiff asserts direct claims against Defendant Correction Officer L. Piper ("C.O. Piper") and supervisory liability claims against Defendant Sheriff DuBois ("DuBois"). As against DuBois, Plaintiff asserts he displayed gross indifference as a supervisor of the correctional facility during the time of the alleged violation. Presently before the Court is Defendants' motion to dismiss the Complaint pursuant to *Rule 12(b)(6) of the Federal Rules of Civil Procedure*. ("*Rule 12(b)(6)*"). (ECF No. 19.) For the following reasons, Defendants' motion is Granted.

**BACKGROUND**

For the purposes of this motion, all facts in Plaintiff's Complaint are taken as true and are construed in the light most [*2] favorable to *pro se* Plaintiff.

*Pro se* Plaintiff Kenneth Eric Washington ("Plaintiff") was housed at the Orange County Correctional Facility ("Jail") on March 5, 2018, and during the days that followed, as a pre-trial detainee. On March 5, 2018, at approximately 5:45 a.m. while in the "E-2 Dormitory" of the facility, Plaintiff was subjected to the poking of his groin by C.O. Piper. Plaintiff subsequently filed a grievance which was denied as meritless. Plaintiff seeks to recover $750,000 in damages for mental anguish, and he requests that officers receive better training in preventing sexual assault and managing cases of alleged sexual assault.

**STANDARD OF REVIEW**

*Rule 12(b)(6)*

*Rule 12(b)(6)* provides in relevant part that a party may motion to dismiss a complaint for "failure to state a claim upon which relief can be granted." *Fed. R. Civ. P. 12*. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)* (*quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*). In evaluating the sufficiency of a complaint, "[a] court 'can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.'" *Hayden v. Paterson, 594 F.3d 150, 161 (2d Cir. 2010)* (*quoting Iqbal, 556 U.S. at 679*). [*3] "At the second step, a court should determine whether the 'well-pleaded factual allegations,' assumed to be true, 'plausibly give rise to entitlement to relief.'" *Hayden, 594 F.3d at 161* (*citing Iqbal, 556 U.S. at 679*); *accord Harris v. Mills, 572 F.3d 66, 72 (2d Cir. 2009)*.

2019 U.S. Dist. LEXIS 206338, *3

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal, 556 U.S. at 678*. "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (internal quotations omitted). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops shorts of the line between possibility and plausibility of entitlement to relief." *Id.* (internal quotations omitted).

Although documents filed *pro se* are to be liberally construed, *see Hill v. Curcione, 657 F.3d 116, 122 (2d Cir. 2011)*, even *pro se* pleadings "must contain factual allegations sufficient to raise a 'right to relief above the speculative level.'" *Dawkins v. Gonyea, 646 F. Supp.2d 594, 603 (S.D.N.Y. 2009)*, quoting *Twombly, 550 U.S. at 555*. A complaint that "tenders 'naked assertions' devoid of 'further factual enhancement'" is insufficient. *Iqbal, 556 U.S. at 678* quoting *Twombly, 550 U.S. at 557*. Thus, while the Court is "'obligated to draw the most favorable inferences'" that the complaint supports, [*4] it "'cannot invent factual allegations that [the plaintiff] has not pled.'" *Parris v. New York State Dep't Corr. Servs., 947 F. Supp. 2d 354, 361 (S.D.N.Y. 2013)* (quoting *Chavis v. Chappius, 618 F.3d 162, 170 (2d Cir. 2010)*. In other words, "the duty to liberally construe a plaintiff's complaint is not the equivalent of a duty to re-write it for him." *Joyner v. Greiner, 195 F. Supp.2d 500, 503 (S.D.N.Y. 2002)*.

**Section 1983**

*Section 1983* provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." *42 U.S.C. § 1983*. *Section 1983* "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan, 443 U.S. 137, 144 n.3, 99 S. Ct. 2689, 61 L. Ed. 2d 433 (1979)*; *see Patterson v. County of Oneida, 375 F.3d 206, 225 (2d Cir. 2004)*. To state a claim under *§ 1983*, a plaintiff must allege "(1) the challenged conduct was attributable to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right

guaranteed by the U.S. Constitution." *Castilla v. City of New York, No. 09-CV-5446(SHS), 2013 U.S. Dist. LEXIS 61633, 2013 WL 1803896, at *2 (S.D.N.Y. April 25, 2013)*; *see Cornejo v. Bell, 592 F.3d 121, 127 (2d Cir. 2010)*. Therefore, a *§ 1983* claim has two essential elements: (1) the defendant acted under color of state law, and (2) as a result of the defendant's actions, the plaintiff suffered a denial of his federal [*5] statutory rights, or his constitutional rights or privileges. *See Annis v. County of Westchester, 136 F.3d 239, 245 (2d Cir. 1998)*; *Quinn v. Nassau Cty. Police Dep't, 53 F. Supp. 2d 347, 354 (E.D.N.Y. 1999)* (*Section 1983* "furnishes a cause of action for the violation of federal rights created by the Constitution.") (citation omitted).

**DISCUSSION**

**Personal Involvement**

Plaintiff fails to assert personal involvement on the part of Defendant DuBois in this matter. In order to hold a defendant responsible for a constitutional deprivation, Plaintiff must demonstrate, *inter alia*, the defendant's personal involvement. *Grullon v. City of New Haven, 720 F.3d 133, 138-39 (2d Cir. 2013)*. "[P]ersonal involvement of Defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [*42 U.S.C. § 1983*.]" *McKinnon v. Patterson, 568 F.2d 930, 934 (2d Cir. 1977)*."The general doctrine of respondeat superior does not suffice and a showing of some personal responsibility of the Defendant is required." *Al-Jundi v. Estate of Rockefeller, 885 F.2d 1060 (2d Cir. 1989)*; *Monell v. New York City Dept. of Social Services, 436 U.S. 658, 692-95, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)*. Supervisory officials may be personally involved within the meaning of *Section 1983* only if he or she participated in unlawful conduct. *See Williams v. Smith, 781 F.2d 319, 323-24 (2d Cir. 1986)*. "A Plaintiff must thus allege a tangible connection between the acts of a Defendant and the injuries suffered." *Bass v. Jackson, 790 F.2d 260, 263 (2d Cir. 1986)*. "[A] Plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal, 556 U.S. 662, 676, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)*. In the context of a prisoner's lawsuit, a Plaintiff must show "more than [*6] the linkage in the prison chain of command" to state a claim against a supervisory defendant. *Ayers v. Coughlin, 780 F.2d 205, 210 (2d Cir. 1985)*.

Here, Plaintiff fails to allege facts of any personal involvement by Defendant DuBois. There is merely the allegation of supervisory approval of the alleged *Section 1983* violation. Within this circuit, courts have held that the mere allegation of supervisory approval, without more, is insufficient to show any personal involvement. See *Gomez v. Sepiol, 11-cv-1017 (SR), 2014 U.S. Dist. LEXIS 53676, 2014 WL 1575872 at *6 (W.D.N.Y., Apr. 11, 2014)*, (Court noting that merely rubber stamping the results of a disciplinary hearing is insufficient to establish personal involvement in a *§ 1983* claim); *Rodriguez v. The City of New York, 644 F. Supp.2d 168, 199 (E.D.N.Y., 2008)* (Complaint against several individual defendants dismissed where Court held that the approval of an employment decision to terminate plaintiff in reliance on other individuals did not constitute personal involvement for *§ 1983* purposes); *Allah v. Poole, 506 F.Supp.2d 174, 190 (W.D.N.Y., 2007)* (dismissing complaint against defendant where sole allegation was that he, as a supervisor, approved the recommendation of another employee to transfer plaintiff to a restrictive housing unit within a correctional facility, holding that mere approval did not establish sufficient personal involvement).

For the aforementioned reasons, the claim against Defendant DuBois is [*7] dismissed for lack of personal involvement.

### *8th Amendment*

The *Eighth Amendment of the United States Constitution* prohibits cruel and unusual punishment against a prisoner. *Whitley v. Albers, 475 U.S. 312, 319, 106 S. Ct. 1078, 89 L. Ed. 2d 251 (1986)*. Sexual abuse of a prisoner by a corrections officer may be the basis for an *8th Amendment* claim under *§ 1983. Boddie v. Schnieder, 105 F.3d 857, 859 (2d Cir. 1997)*. To establish a violation of the *Eighth Amendment*, the following two elements must be met: (1) The alleged abuse must be "objectively, sufficiently serious"; and (2) the prison official must have a "sufficiently culpable state of mind." *Farmer v. Brennan, 511 U.S. 825, 834, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994)*.

Even though Plaintiff does no specifically discern in his Complaint, he was a pre-trial detainee. (ECF No. 20). Therefore, Plaintiff's allegations must sufficiently state a claim against Defendant Piper under the *Fourteenth Amendment* standard applicable to pretrial detainees. See *Darnell v. Pineiro, 849 F.3d 17, 35 (2d Cir. 2017)* citing *Kingsley v. Hendrickson, U.S., 135 S. Ct. 2466,*

*2476, 192 L. Ed. 2d 416 (2015)*.

Under the objective standard,[1] the sexual abuse must be "objectively, sufficiently serious" considering "contemporary standards of decency, but "conditions that cannot be said to be cruel and unusual under contemporary standards are not unconstitutional." *Boddie v. Schnieder, 105 F.3d 857, 861 (2d Cir. 1997)* quoting *Rhodes v. Chapman, 452 U.S. 337, 347, 101 S. Ct. 2392, 69 L. Ed. 2d 59 (1981)*; see also *Crawford v. Cuomo, 796 F.3d 252 (2d Cir. 2015)*. In *Boddie, infra*, though the Court held that certain allegations of sexual abuse may violate contemporary standards of decency and constitute a violation of the *Eighth Amendment*, it noted that the alleged abuse must be "severe or repetitive" to establish [*8] that the conduct complained of was objectively, sufficiently serious. See *Boddie v. Schnieder, 105 F.3d at 861*. The *Boddie* Court rejected allegations of a small number of incidents in which the defendant made inappropriate comments, touched Plaintiffs genitals and pressed against Plaintiff without his consent, and the Court found this was not in violation of the *Eighth Amendment. Id.*

Courts following *Boddie*, have noted that where the allegation is "a single incident of sexual abuse" it must be "sufficiently severe or serious," in order to objectively violate the *Eighth Amendment* in that the act alleged must demonstrate "intentional contact with an inmate's genitalia ... which serves no penological purpose and is undertaken with the intent to gratify the officer's sexual desire or humiliate the inmate." *Crawford, 796 F.3d at 257-58* (finding objective prong satisfied where officer was alleged to have "fondl[ed] and squeeze[ed] [the inmate's] penis," "roamed" the inmate's thigh, to "make sure [he] did not have an erection"); see also *Shannon v. Venettozzi, 670 Fed. Appx. 29, 31 (2d Cir. 2016)* (allegations that officer hit and fondled the inmate's genitals and rubbed his buttocks while stating that "[t]his is my visiting room and I run it the way I want," on four occasions sufficient for *Eighth Amendment* violation); *Shepherd v. Fischer, 08-cv-9297 (RA), 2018 U.S. Dist. LEXIS 106682, 2018 WL 3122053 at *2 (S.D.N.Y. June 26, 2018)* (inmate [*9] allegations that officer "rammed" a metal wand "between [his] ... butt cheeks," and stating to inmate that he "should ... 'f' [Plaintiff] with it," sufficient for *Eighth Amendment* violation); cf. *Shitlman v. Makram, 14-cv-6589 (NSR), 2018 U.S. Dist. LEXIS*

---

[1] An assessment of the objective standard remains pursuant to the same standards as the *Eighth Amendment* proscribed prior to *Darnell v. Pineiro, 849 F.3d 17, 35 (2d Cir. 2017)*.

*132177, 2018 WL 3745670 at \*5, (S.D.N.Y. Aug. 6, 2018)* (officer alleged to have "nearly stuck their fingers ... between [Plaintiffs] buttcheeks [sic]," not sufficient to establish an *Eighth Amendment* claim).

In the present matter, Plaintiff alleges that he was subjected to a single incident of a poke to "the groin (penis)." (ECF No. 2). Accepting Plaintiff's version of the facts as true, these allegations fail to rise to the level of a constitutional violation to support a *Section 1983* claim. *See Boddie, infra, Crawford, infra.* Plaintiff also failed to allege sufficient facts concerning the severity of the poke. The allegations fail to identify any physical injury. The Complaint is simply devoid of any facts which would contextualize the poke to such a degree that it would support a finding that it was an effort to "arouse or gratify the officer or humiliate the inmate." *Crawford v. Cuomo, 796 F.3d at 257-58*.

As noted by the court in *Boddie*, though the isolated episodes of alleged touching may be unsavory, "they do not involve a harm of federal constitutional proportions as defined by the Supreme [\*10] Court." See *Montero v. Crusie, 153 F.Supp.2d 368, 373, 375 (S.D.N.Y. 2001)* (allegation that correctional officer squeezed inmate's genitalia while pat-frisking him not sufficient to sustain an *Eighth Amendment* claim, especially where no allegation of injury); *Harry v. Suarez, 2012 U.S. Dist. LEXIS 79551, 2012 WL 2053533, at \*3 (S.D.N.Y., June 4, 2012)* (allegations that corrections officer groped plaintiff's genitals, buttocks, and inner thighs for up to 53 seconds during frisk insufficient to sustain *Eighth Amendment* claim); *Williams v. Keane, 1997 U.S. Dist. LEXIS 12665, 1997 WL 527677, \*9-11 (S.D.N.Y., Aug. 25, 1997)* (dismissing the *Eighth Amendment* claim as insufficient where defendant put his hand down plaintiff's pants and fondled plaintiff's testicles).

Plaintiff's allegation of minimal contact by Defendant Piper is an example of a single incident which is not "sufficiently severe or serious," and does not objectively violate the Constitution. *See Crawford v. Cuomo, 796 F.3d 252, 257-58 (2d Cir. 2015)* (finding objective prong satisfied where officer was alleged to have "fondl[ed] and squeeze[ed] [the inmate's] penis," "roamed" the inmate's thigh, to "make sure [he] did not have an erection").

While the subjective prong, requires an assessment of "whether the contact is incidental to legitimate official duties, such as justifiable pat frisk or strip search, or by contrast whether it is undertaken to arouse or gratify the officer or humiliate the inmate," the analysis must take

place in the context of Plaintiffs status as a [\*11] pretrial detainee. *Crawford v. Cuomo, 796 F.3d at 257-58; see also Darnell v. Pineiro, 849 F.3d 17, 35 (2d Cir. 2017)* (Plaintiffs claims as pretrial detainee are "governed by the *Due Process Clause of the Fourteenth Amendment*, rather than ... the *Eighth Amendment*"). As a pretrial detainee, Plaintiff need only establish that his detention conditions were "'sufficiently serious to constitute objective deprivations of the right to due process' and that the officer acted intentionally or with at least deliberate indifference to the challenged conditions. " *Noonan v. New York City Police Department Officer Carlos Becker, 14-cv-4084 (LTS) (JLC), 2017 U.S. Dist. LEXIS 135216, 2017 WL 3638201 at \*4 (S.D.N.Y. Aug. 23, 2017)*, quoting *Darnell v. Pineiro, 849 F.3d at 29, 35*.

Under the subjective prong, the Plaintiff must allege that Defendant Piper's poke to the groin was "'sufficiently serious to constitute objective deprivations of the right to due process' and that the officer acted intentionally or with at least deliberate indifference to the challenged conditions." *Id.* quoting *Darnell v. Pineiro, 849 F.3d at 29, 35*. While "where no legitimate law enforcement or penological purpose can be inferred from the defendant's alleged conduct, the abuse itself may, in some circumstances be sufficient evidence of a culpable state of mind," *Boddie, supra, 861*, "the principal inquiry is whether the contact is incidental to legitimate official duties, such as justifiable pat frisk or strip search, [\*12] or by contrast whether it is undertaken to arouse or gratify the officer or humiliate the inmate." *Crawford v. Cuomo, supra, at 257-58; Shtilman v. Makram, 14-cv-6589 (NSR), 2018 U.S. Dist. LEXIS 132177, 2018 WL 3745670 at \*5, (S.D.N.Y. Aug. 6, 2018)* (officer alleged to have "nearly stuck their fingers ... between [Plaintiff's] buttcheeks [sic]," not sufficient to establish an *Eighth Amendment* claim).

Plaintiff's bare allegations of a poke to the groin while he was in inside of his housing unit fail to assert sufficient facts. The Plaintiff does not assert any injury to Plaintiff, allegations of statement or comment by Defendant Piper, provide further description of the surrounding circumstances, nor indicate whether he was awake or asleep just prior to the incident. Plaintiff fails to allege sufficient objective facts of an act which is sufficiently severe and serious. Plaintiff also fails to allege facts of Defendant Piper's culpable state of mind as required under the *Fourteenth Amendment. See Shepherd v. Fisher, 08-cv-9297 (RA), 2017 U.S. Dist. LEXIS 22772, 2017 WL 666213, at \*18 (S.D.N.Y. Feb. 16, 2017)* ("squeezing and fondling of Plaintiff's genitalia, combined with the accompanying threats of sexual

violence or retaliation, would allow a reasonable factfinder to find that the corrections officer ... intended to sexually gratify themselves, to humiliate [], or both."); *see also Shannon v. Venettozzi, 670 Fed. Appx. at 31* ("[sexually-explicit] statements, [*13] in conjunction with ... description of the forcefulness of the pat-downs were sufficient to plausibly allege that [the officer] conducted the pat-downs" to gratify himself or humiliate the inmate).

For the aforementioned reasons, Plaintiff's complaint fails to state a claim of an *8th Amendment* violation.

## COMPENSATORY DAMAGES

Plaintiff seeks seven hundred fifty thousand dollars ($750,000.00) in damages for the alleged violations of his constitutional rights. However, Plaintiff failed to specifically denominate what type of injury he sustained. *Section 1997e(e) of the PLRA* states that — "No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." Plaintiff does not allege any physical injury resulting from the claimed deprivation of his constitutional rights — rather, he only alleges emotional harm. (ECF No. 2). For claims seeking damages for mental or emotional damages, a defendant must "make a prior showing of physical injury." *Jenkins v. Haubert, 179 F.3d 19, 28 (2d Cir. 1999)*. In this matter, Plaintiff failed to assert sufficient facts to support a finding of a requisite harm of physical injury.

Separately, to the extent [*14] that plaintiff's claim for damages includes punitive damages, such measure of damages is not warranted. Plaintiff has not alleged any facts indicating that defendants' conduct was "motivated by evil motive or intent" or that defendants exhibited "reckless or callous indifference" to his federally protected rights which is a pre-requisite to the imposition of punitive damages. *Lee v. Edwards, 101 F.3d 805, 808 (2d Cir. 1996)* (quoting *Smith v. Wade, 461 U.S. 30, 56, 103 S. Ct. 1625, 75 L. Ed. 2d 632 (1983))*.

## QUALIFIED IMMUNITY

Qualified immunity protects government officials from liability as long as their actions are discretionary in nature and do not violate clearly established statutory or constitutional rights of which a reasonable person

should have known." *Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)*. "Qualified immunity is available 'when the undisputed facts establish that it was objectively reasonable for the defendants to believe that their actions did not violate clearly established rights.'" *Dawkins v. Gonyea, 646 F.Supp.2d 594, 613 (S.D.N.Y. 2009)*, quoting *Defore v. Premore, 86 F.3d 48, 50 (2d Cir. 1996)*. "A right is clearly established if (1) the law is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has recognized the right, and (3) a reasonable defendant [would] have understood from the existing law that [his] conduct was unlawful." *Johnson v. Goord, 487 F. Supp. 2d 377, 398 (S.D.N.Y. 2007)*, aff'd *305 Fed. Appx. 815 (2d Cir. 2009)* (internal quotations and citations omitted). The Supreme Court has [*15] urged courts to decide the issue of qualified immunity at the earliest possible opportunity. *See Saucier v. Katz, 533 U.S. 194, 200, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001)*, overruled on other grounds, *Pearson v. Callahan, 555 U.S. 223, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009)*. "[T]he question to be answered is whether the defendant officer, confronted with the facts as alleged by the plaintiff, could reasonably have believed that his actions did not violate some settled constitutional right." *5 Borough Pawn, LLC v. City of New York, 640 F.Supp.2d 268, 285 (S.D.N.Y. 2009)*; accord *Dawkins, supra, at 613*.

The facts as alleged are insufficient to establish a constitutional or statutory violation on the part of Defendant Piper. It was objectively reasonable for a correctional officer to believe that his actions were lawful, if true, under the circumstances. No facts were alleged as to the conduct by Defendant DuBois. Therefore, Defendants are entitled to qualified immunity, and the operative Complaint is dismissed against Defendants Piper under *Rule 12(b)(6)*.

## CONCLUSION

For the aforementioned reasons, Defendants' motion to dismiss the Complaint is granted in its entirety. The Clerk of the Court is respectfully directed to terminate the motion at ECF No. 19, to close the case, to mail a copy of this Opinion and Order to Plaintiff's last known address and to show proof on the docket.

Dated: November 26, 2019

White Plains, New York

SO ORDERED

2019 U.S. Dist. LEXIS 206338, *15

/s/ Nelson [*16]  S. Román

NELSON S. ROMÁN

---

**End of Document**