**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK**

CAMILLE J. SIANO ENDERS,

                                        Plaintiff,                    1:19-cv-948 (BKS/CFH)

v.

JERRY BOONE, individually and as Commissioner of the
New York State Department of Taxation and Finance,
HONORA MANION, individually and as Executive
Deputy Commissioner of the New York State Department
of Taxation and Finance, and MARY STARR, individually
and as Associate Director of Human Resources at the New
York State Department of Taxation and Finance,

                                        Defendants.

**Appearances:**

*Plaintiff pro se:*
Camille J. Siano Enders
Scotia, NY 12302

*For Defendants:*
Letitia James
Attorney General of the State of New York
Adrienne J. Kerwin
Assistant Attorney General, of Counsel
The Capitol
Albany, NY 12224

**Hon. Brenda K. Sannes, Chief United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

I.      **INTRODUCTION**

        Plaintiff pro se Camille Siano Enders commenced this action under 42 U.S.C. § 1983

against Defendants Jerry Boone, Honora Manion, and Mary Starr, in their individual and official

capacities, alleging that Defendants terminated her employment with the New York State

Department of Taxation and Finance ("DTF") in retaliation for speech protected by the First Amendment. (Dkt. No. 1). Specifically, Plaintiff claims that Defendants terminated her employment with DTF in retaliation for her campaign to be elected Justice of the New York Supreme Court, Fourth Judicial District, in violation of the First Amendment. (*See generally id.*). Defendants move for summary judgment under Federal Rule of Civil Procedure 56 and seek dismissal of Plaintiff's complaint. (Dkt. No. 57). The parties filed responsive briefing. (Dkt. Nos. 64, 65). For the following reasons, Defendants' motion is granted in part and denied in part.

## II.    FACTS[1]

### A.    The Parties' Employment with DTF

Plaintiff began working for DTF in January 2013 as a Deputy Commissioner and Taxpayer Rights Advocate. (Dkt. No. 57-9, at 21). She became Deputy Commissioner and Director of the Bureau of Conciliation and Mediation Services ("BCMS") in July 2014 and remained in that role until her employment with DTF ended. (*Id.* at 21–22). As a Deputy Commissioner, Plaintiff was an "exempt class employee" who served at the pleasure of the Administration. (Dkt. No. 57-2, ¶ 1(a), (m); Dkt. No. 64-13, ¶ 1(a), (m)).

Defendant Boone served as the Commissioner of DTF beginning in 2015 and retired from the agency in September 2016. (Dkt. No. 57-3, ¶¶ 3, 7, 32). Defendant Manion joined DTF in 1988 and served as the agency's Executive Deputy Commissioner from 2013 until her retirement in March 2019. (Dkt. No. 57-4, ¶¶ 3–4). Defendant Starr served as DTF's Assistant

---

[1] The facts are drawn from Defendants' statement of material facts and Plaintiff's response to Defendant's statement of material facts and statement of additional material facts in dispute (Dkt. Nos. 57-2, 64-13), to the extent the facts are well-supported by pinpoint citations to the record, as well as the exhibits attached thereto and cited therein. The Court notes that Defendants' statement of material facts often cites to a particular declaration or exhibit or to a declaration, without providing a specific pinpoint citation. The facts are construed in the light most favorable to Plaintiff as the non-moving party. *Gilles v. Repicky*, 511 F.3d 239, 243 (2d Cir. 2007).

Director of Human Resources from 2013 to 2017, and as Director of Human Resources from 2017 until her retirement in December 2018. (Dkt. No. 57-5, ¶¶ 3–4).

### B.    The 2015 Campaign

In 2015, prior to her run for Supreme Court Justice, Plaintiff unsuccessfully ran for re-election as a part-time Judge in Duanesburg Town Court (the "2015 Campaign"). (Dkt. No. 57-2, ¶ 14; Dkt. No. 64-13, ¶ 14). DTF approved Plaintiff's request to conduct the 2015 Campaign outside of work hours. (Dkt. No. 57-2, ¶ 15; Dkt. No. 64-13, ¶ 15). The New York State Inspector General ("IG") investigated a complaint that Plaintiff "was engaging in outside employment as well as activities related to her re-election campaign for town justice during state work hours." (Dkt. No. 57-3, at 7). In a letter to Boone dated January 7, 2016, the IG summarized the results of her investigation. (*Id.* at 7–8). The IG's investigation determined that Plaintiff had received approval from DTF and the New York State Joint Commission on Public Ethics ("JCOPE") for three outside activities, one of which was serving as Town Justice in Duanesburg involving "eight hours of evening work per week." (*Id.* at 7). The investigation further determined that Plaintiff "appropriately charged leave accruals when her appearances in court . . . conflicted with her DTF work schedule" and found no evidence that Plaintiff "used state equipment or resources in furtherance" of her outside activities. (*Id.* at 7–8). However, because the IG's office "obtained testimony from four witnesses" that Plaintiff was placing and receiving calls pertaining to her outside activities during the workday, it also reviewed her personal cell phone records. (*Id.* at 8). The review of Plaintiff's personal cell phone records for March to mid-October 2015 "identified 261 calls, totaling 25 hours, between her and the Duanesburg Town Court during work hours" and "48 calls, totaling 3.5 hours, between [Plaintiff] and individuals associated with her re-election campaign during work hours." (*Id.*).

The IG recommended that Boone "review these findings and take action as [he] deem[ed] appropriate." (*Id.*; *see also* Dkt. No. 57-3 (IG memorandum summarizing investigation)).

After reviewing the IG's findings, Boone "exercised [his] discretion not to renew Plaintiff's discretionary leave from her 'hold item,'" [2] which was set to expire in March 2016. (Dkt. No. 57-3, ¶ 20). Boone was "concerned about [Plaintiff's] management of [her] dual activities" based on the IG's investigation, (Dkt. No. 64-10, at 72–74), but "indicated to Plaintiff [they] could revisit the possibility of a hold item in the future," (Dkt. No. 57-3, ¶ 21). According to Plaintiff, Boone did not renew her hold item "as a result of [the IG's] memo." (Dkt. No. 57-9, at 117; *see also* Dkt. No. 64-1, ¶ 4 (Plaintiff affidavit stating that Boone indicated he did not renew her hold item "as a consequence for causing an investigation by the Office of Inspector General")).[3] Plaintiff felt that the non-renewal of her hold item was "punishment." (Dkt. No. 57-9, at 118).

## C. The 2016 Campaign

### 1. Approval

On March 28, 2016, Plaintiff requested approval from DTF for the outside activity of running for the office of Justice of the New York Supreme Court, Fourth Judicial District (the "2016 Campaign"). (Dkt. No. 57-6, at 8). Plaintiff's request indicated that her campaign activities "should be on nights and weekends" with "occasional need for time off for travel

---

[2] A "hold item" is a competitive civil class position which is allocated to an employee serving in an exempt position and to which the employee can "revert" if she loses the exempt position. (Dkt. No. 57-3, ¶ 20).

[3] Defendants argue that the Court should disregard Plaintiff's affidavit submitted in opposition to the motion for summary judgment "[t]o the extent that Plaintiff now claims to possess information relevant to this motion that she failed to recall at the time of her deposition." (Dkt. No. 65, at 8–9 & n.2 (listing deposition questions to which Plaintiff responded she did not know or recall)). While the sham issue of fact doctrine "prohibits a party from defeating summary judgment simply by submitting an affidavit that contradicts the party's previous sworn testimony," the contradiction must be "real, unequivocal, and inescapable." *Stajic v. City of New York*, No. 16-cv-1258, 2018 WL 4636829, at *10 n.5, 2018 U.S. Dist. LEXIS 167035, at *32 n.5 (S.D.N.Y. Sept. 27, 2018) (citations omitted). Defendants have not pointed to any specific portion of Plaintiff's affidavit which unequivocally contradicts her deposition testimony which they seek to have disregarded.

purposes." (*Id.*). The request also referenced New York State Ethics Commission Advisory

Opinion No. 98-12 and acknowledged that "a state employee . . . cannot solicit funds directly

from any sources that may have business for them or any one they supervise as a state

employee." (*Id.*; *see also id.* at 17–22 (Advisory Opinion No. 98-12)). Advisory Opinion No. 98-

12 states that "campaign activities" may not be "conducted from a State office or during State

business hours unless leave is taken" and prohibits State employees from soliciting from

subordinates, "as this practice is strictly forbidden by Civil Service Law §107." (*Id.* at 21). The

opinion also provides that a State employee "may participate in mass mailings, even if some of

the letters will reach individuals or business entities from which he otherwise could not solicit

funds." (*Id.* at 17; *see id.* at 22 (quoting the federal definition of a mass mailing, which is

permissible "unless it is known to the employee that the solicitation is targeted at subordinates or

at persons who are prohibited sources")).

Plaintiff's request to participate in the 2016 Campaign was approved, subject to certain

restrictions, by Boone and Margaret Neri, Deputy Commissioner and Ethics Officer at DTF. (*Id.*

at 7). These restrictions included: (1) "[l]eave time must be charged for any work or activity

done during the normal work day for this outside activity," (2) "[a]ll activities must be done on

the employee's own time," (3) "[n]o State resources of any type may be used to accomplish [the]

outside activity," and (4) a reminder that Civil Service Law § 107 "prohibits any and all political

activity in the workplace." (*Id.*). It is undisputed that a State employee's time during the workday

is a State resource. (Dkt. No. 57-2, ¶ 40; Dkt. No. 64-13, ¶ 40).

In March 2016, Plaintiff also requested and received approval from JCOPE to conduct

the 2016 Campaign. (*See* Dkt. No. 57-6, at 11–12 (JCOPE approval letter dated March 29,

2016)). JCOPE's approval letter advised Plaintiff that "actions associated with [her] outside

activity are not permitted during State work hours and should not interfere with [her] work responsibilities," and stated that no State resources may be used to accomplish the outside activity. (*Id.* at 11). The letter further provided that "subordinate employees may not participate in [the] outside activity." (*Id.*). The letter referenced and discussed the requirements set forth in Advisory Opinion No. 98-12 and Civil Service Law § 107. (*Id.* at 12 ("The law also prohibits the use of one's official State position to coerce, intimidate, or otherwise influence State employees to give money or service or any valuable thing for any political purpose . . . .")).

On April 1, 2016, Boone and Neri met with Plaintiff to discuss the approval of Plaintiff's request to conduct the outside activity of running for Supreme Court Justice. (Dkt. No. 57-6, at 14; *see also* Dkt. No. 57-6, ¶ 10 (Neri declaration stating that they met "to discuss the restrictions on [Plaintiff's] activity")). According to an email Neri wrote summarizing the meeting, Boone was "concern[ed]" about "whether [Plaintiff's] election activities would impact [her] responsibilities at DTF." (Dkt. No. 57-6, at 14). Plaintiff told Boone and Neri that "most election activities" would take place during the evenings or on weekends and that she expected to charge her leave accruals if she needed to take time for traveling around the district. (*Id.*). Boone noted that Plaintiff was highly visible at DTF and would be highly visible to the public during the 2016 Campaign, and asked Plaintiff "how [she] intended to deal with the appearance of a conflict between [her] DTF job and [her] election activities." (*Id.*). Boone noted that "there has been increased scrutiny of political activity by those in State service" and "reiterated his recommendation that [Plaintiff] keep the election activities completely separate from [her] DTF work." (*Id.*). Neri recommended that Plaintiff "obtain a separate cellphone" for communications pertaining to the 2016 Campaign and referred Plaintiff to Advisory Opinion No. 93-9, which notes that campaigns for public office must be run on an employee's own time. (*Id.* at 14–15).

2.      **Events During the 2016 Campaign**

a.      **Lynn Rivers's Observations**

In early April 2016, Neri asked Lynn Rivers, an administrative assistant who reported directly to Plaintiff, to "keep track of Plaintiff's campaign activities while at DTF." (Dkt. No. 57-6, ¶ 15 (Neri declaration); Dkt. No. 57-7, ¶ 5 (Rivers declaration stating the same); Dkt. No. 64-8, at 18–19 (Rivers deposition testimony that Neri asked her to "just be watchful about time and attendance and anything that would be ethically inappropriate during office time")). Neri asserts that she took this action on her own volition in her capacity as Ethics Officer. (Dkt. No. 57-6, ¶ 16).[4] Rivers, whose desk was right outside Plaintiff's office, kept "contemporaneous written notes" relevant to Neri's request which she "typed up and provided to Deputy Commissioner Neri." (Dkt. No. 57-7, ¶ 7; *see id.* at 5–11 (Rivers's typed notes spanning April 4 through August 4, 2016)). Rivers's typed notes generally record when Plaintiff arrived late or left work early, "engaged in political business discussion on personal cell" in the office, or went to her car to make phone calls. (*See generally id.* at 5–11). Plaintiff asserts that these notes are "replete with errors," noting that Rivers stated Plaintiff took May 20, 2016 off for political business or networking, when in fact Plaintiff took the day off to tend to a sick child. (Dkt. No. 64-1, ¶ 18; *see* Dkt. No. 57-7, at 6; Dkt. No. 64-5). Neri reviewed Rivers's typed notes and provided them to DTF's Office of Internal Affairs ("OIA"). (Dkt. No. 57-6, ¶¶ 17, 20). When Rivers provided typed notes to Neri on August 3, 2016, she commented: "There is not enough time in my day to keep a record of the unethical conduct I observe in my particular location. [Deputy

---

[4] Plaintiff disputes this assertion and states that, "[u]pon information and belief," Neri was "working with" DTF's Office of Internal Affairs. (*See* Dkt. No. 64-13, ¶ 42). However, Rule 56's "requirement that affidavits be made on personal knowledge is not satisfied by assertions made 'on information and belief.'" *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 138 (2d Cir. 2009) (quoting *Patterson v. County of Oneida, N.Y.*, 375 F.3d 206, 219 (2d Cir. 2004)). Plaintiff has not pointed to any evidence indicating that any other individual was involved in Neri's request of Rivers.

Commissioner] Richard [Ernst] and Camille discuss the campaign frequently throughout the day. It never stops." (Dkt. No. 57-6, at 33). Neri forwarded the notes and memorialized Rivers's statement in an email to an investigator with OIA. (*Id.*).

Rivers asserts that on "numerous occasions in the spring and summer of 2016," she overheard Plaintiff "discussing her political campaign with fellow Deputy Commissioner Richard Ernst while at DTF" and overheard Plaintiff "on the phone while at DTF discussing her political campaign." (Dkt. No. 57-7, ¶¶ 9–10).[5] At her deposition, Rivers testified that, while she overheard some phone conversations, she did not recall "the exact conversation, just that it was related to the campaign." (Dkt. No. 64-8, at 32; *see also id.* at 46 (testifying that she heard Plaintiff having conversations with Ernst "in passing" about "upcoming events")). Rivers's notes and affidavit reflect that Plaintiff discussed upcoming political events at a staff lunch while at the DTF office. (Dkt. No. 57-7, at 8, 15 (noting that this took place "in our office")). Rivers further asserts that Plaintiff provided her with an emery board promoting her campaign and campaign literature and "asked [her] to review headshots for her political campaign" while at the DTF office. (Dkt. No. 57-7, ¶¶ 12–13). Plaintiffs denies that there was an emery board related to her campaign. (Dkt. No. 64-1, ¶ 9).

According to Rivers, Plaintiff asked her for her home address sometime in the spring or summer of 2016. (Dkt. No. 57-7, ¶ 14). Rivers asserts that she "felt obligated" to provide the address because Plaintiff was her superior. (*Id.*; *see also* Dkt. No. 64-8, at 40–41, 44–45 (Rivers testifying at deposition that her address is in the phone book, that she may have given her address to Plaintiff when she first started working for her for emergency purposes, and that she recalls

---

[5] Deputy Commissioner Richard Ernst received approval from DTF to participate in the 2016 Campaign. (Dkt. No. 64-3).

feeling obligated to provide her address when asked for it by Plaintiff)). According to Plaintiff, however, Rivers asked Plaintiff in April 2016 "what she could do to help" with the 2016 Campaign. (Dkt. No. 64-1, ¶ 12; *but see* Dkt. No. 64-8, at 41 (Rivers testifying at deposition that she did not remember asking Plaintiff to put her address on a campaign list and that she is "not politically active")). Plaintiff told Rivers she could not help with the campaign and that "even if [they] kept everything out of the office it would be inappropriate because [Rivers] reported to [Plaintiff]." (Dkt. No. 64-1, ¶ 12). Plaintiff told Rivers that, if Rivers provided her home address, Plaintiff "would pass it on to the campaign committee"; shortly thereafter, Rivers "handed [Plaintiff] a Post-It Note with her name and home address written on it." (*Id.* ¶¶ 12–13). The parties agree that Plaintiff's campaign sent an invitation for a campaign fundraiser to Rivers's home address in early August 2016. (Dkt. No. 57-7, ¶ 15; Dkt. No. 64-13, ¶ 66; Dkt. No. 57-7, at 19–20 (invitation with suggested donation between $25 and $250)).

### b.   Campaign Email

On June 2, 2016, an attorney from DTF's Office of Counsel forwarded to Neri a campaign email that Plaintiff's campaign had sent to the attorney's DTF email address. (Dkt. No. 57-6, ¶ 18; *see* Dkt. No. 57-6, at 24–29 (email)). The email was sent by Plaintiff's campaign and requested the recipient's support in the form of a campaign contribution. (*Id.* at 25–29). Neri in turn forwarded the email to the director of OIA. (*Id.* at 24). Also on June 2, Neri emailed Plaintiff asking: "Are you aware that an email blast from your campaign has been received at NYS agency mailboxes?" (*Id.* at 31). Plaintiff responded that she knew that "we were sending out an email to the Capital District Women's Bar Association email list" and hypothesized that perhaps some members "use their state agency email addresses" for bar association membership. (*Id.*). Neri responded: "Political solicitations to state email addresses is prohibited. Please take steps to 'scrub' the email lists you use in this way." (*Id.*).

Shortly after Plaintiff's campaign sent out this email, Manion "reminded Plaintiff that she needed to be more cautious about the use of State time and resources—including use of work time and DTF e-mail—and that even the appearance of not following the rules was a problem." (Dkt. No. 57-4, ¶ 8; Dkt. No. 64-13, ¶ 48).

### c.      Lisa Surprenant's Observations

Lisa Surprenant, an administrative assistant at DTF, worked directly for Plaintiff while Plaintiff served as Deputy Commissioner and Taxpayer Rights Advocate between January 2013 and July 2014. (Dkt. No. 57-10, ¶¶ 3–4). Surprenant asserts that Plaintiff "stopped by [her] desk at DTF" on "multiple occasions in the spring and summer of 2016" to "discuss her political campaign." (*Id.* ¶ 5; *see* Dkt. No. 57-10, at 5 ("I have on several occasions had Camille stop at my desk and talk about her campaign. She mentions how tired she is and how much traveling she does to attend all the events.")). On one such occasion, Plaintiff asked Surprenant "if [Surprenant's] husband had friended the Facebook account of her political campaign." (Dkt. No. 57-10, ¶ 6).

On July 13, 2016, Plaintiff asked Surprenant if she had received an invitation to a fundraiser for the 2016 Campaign which was held the day before, and Surprenant responded that she had not. (Dkt. No. 57-10, ¶ 7). According to Surprenant, Plaintiff became "very upset." (*Id.*).[6] On July 14, 2016, Surprenant signed a sworn affidavit about Plaintiff for OIA. (*Id.* ¶ 9; *see* Dkt. No. 57-10, at 4–5 (affidavit)). In early August, she received an invitation to a fundraiser for

---

[6] Plaintiff objects that Surprenant "cannot testify to Plaintiff's state of mind." (Dkt. No. 64-13, ¶ 77). However, a witness may offer a lay opinion so long as that opinion is based on her "own personal knowledge, which must be established to the court and jury." *United States v. Garcia*, 291 F.3d 127, 140 (2d Cir. 2002). Surprenant could testify as to the objective bases for her opinion that Plaintiff was upset when Surprenant said she did not receive the invitation.

Surprenant further asserts that Richard Ernst also asked her if she had received an invitation to Plaintiff's campaign fundraiser. (Dkt. No. 57-10, ¶ 8). Surprenant indicated that she had not and declined Ernst's offer to provide the address to "pledge to Plaintiff's campaign," telling him that she "did not participate in or contribute to political campaigns." (*Id.*).

Plaintiff's campaign at her home address. (Dkt. No. 57-10, ¶ 10; Dkt. No. 57-10, at 7–8 (invitation)).

### 3.     Office of Internal Affairs Investigation

After discussing the campaign email with Plaintiff, Manion "heard that Plaintiff had been discussing the campaign at DTF with DTF workers, including [Ernst]," and "making campaign-related calls while at DTF." (Dkt. No. 57-4, ¶ 9).[7] Manion therefore "referred the matter" to OIA for investigation. (*Id.*). The information OIA considered as part of its investigation included Plaintiff's timesheets for the period of March 24, 2016 through August 10, 2016; Rivers's typed notes; a sworn affidavit from Rivers; and a sworn affidavit from Surprenant. (*See generally* Dkt. No. 57-8).[8] Rivers's sworn affidavit largely tracks her typed notes. (*Compare* Dkt. No. 57-7, at 5–11 (notes), *with id.* at 13–17 (affidavit)). OIA compared Rivers's affidavit with Plaintiff's timesheets and identified potential areas of concern where Plaintiff may not have charged her time appropriately. (*See* Dkt. No. 57-8, at 40–43 (comparison spreadsheet)). Plaintiff asserts that her work hours at DTF were flexible and she worked "any time between 8am and 6pm each weekday." (Dkt. No. 64-1, ¶ 16). Because her timesheets "do not indicate a work schedule or

---

[7] Plaintiff objects that this "fact is based entirely on non-admissible hearsay." (Dkt. No. 64-13, ¶ 51). However, what Manion heard about Plaintiff's campaign-related activities is not hearsay if offered for its effect on the listener, i.e., that what Manion heard prompted her to refer the matter to OIA for investigation.

[8] Plaintiff objects to the declaration of John Scott Gullie and the exhibits attached thereto on the ground that Gullie was not named as a potential witness in Defendants' Rule 26 disclosures. (*See, e.g.*, Dkt. No. 64-13, ¶ 54). Rule 37 provides that a party who "fails to provide information or identify a witness as required by Rule 26(a) or (e)" is "not allowed to use that information or witness to supply evidence on a motion . . . , unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). In determining whether to exclude evidence under Rule 37(c)(1), courts must consider: (1) the party's explanation for the failure to comply with its disclosure obligations; (2) the importance of the evidence sought to be precluded; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new information; and (4) the possibility of a continuance. *Patterson v. Balsamico*, 440 F.3d 104, 117 (2d Cir. 2006). Defendants have offered no explanation for their failure to name Gullie in their Rule 26 disclosure, but assert that the purpose of Gullie's declaration is to submit DTF documents with sufficient foundation and provide context for those documents. (Dkt. No. 65, at 9–10). Defendants further represent that they produced these documents to Plaintiff during discovery. (*Id.* at 10). Under these circumstances, the Court will consider Gullie's declaration and the attached exhibits, as there is no indication that Plaintiff has suffered any prejudice as a result of Defendants' failure.

specific hours and times worked," (*id.* ¶ 17), Plaintiff argues that a mere comparison of her timesheets with Rivers's affidavit, without specific information about when Plaintiff was in the office, is insufficient to determine whether she charged appropriate amounts of leave, (Dkt. No. 64-13, ¶ 68).

The parties dispute the findings and/or import of the OIA investigation. According to Gullie, who served as the Assistant Director of OIA, the OIA's investigation "revealed evidence that Plaintiff conducted her political campaign, in part, physically at DTF and on DTF time." (Dkt. No. 57-8, ¶ 12). The OIA report of the investigation that Plaintiff obtained via a FOIL request, however, contains no specific substantiated findings of improper resource use. (*See generally* Dkt. No. 64-6).[9] Plaintiff generally denies that she conducted any activities relating to the 2016 Campaign at DTF. (Dkt. No. 64-1, ¶ 27).

### D.    Plaintiff's Termination

Manion asserts that "OIA briefed [her] on the results of the investigation." (Dkt. No. 57-4, ¶ 10). Manion states that she learned from this briefing that "the investigation revealed evidence that Plaintiff had, in fact, violated the restrictions about not using DTF time and resources to conduct the campaign." (*Id.*). At her deposition, Manion testified that she did not remember who from OIA briefed her on these findings and that she did not recall reviewing any documentation which would support those findings. (Dkt. No. 64-9, at 67–68). While she was not informed of "the specifics," Manion states that she was told there were findings that Plaintiff and Ernst were "doing campaigning on work time." (*Id.* at 66). Manion asserts that, "[a]s a result of the investigative findings briefed to [her], [she] determined that Plaintiff should be terminated for cause because she violated the restrictions placed on her by the Commissioner of DTF and

---

[9] The Court notes that the OIA Report provided by Plaintiff contains certain unexplained redactions.

JCOPE." (Dkt. No. 57-4, ¶ 11). Her decision was based in part on her understanding that "the OIA determination constituted the second time in less than a year an investigative agency found Plaintiff misused DTF time and resources to conduct outside activity." (*Id.*).

Manion informed Boone, who was on medical leave at the time, that she was going to terminate Plaintiff for violating the restrictions placed on her outside activity. (*Id.* ¶ 13; Dkt. No. 57-3, ¶ 29). Boone "agreed with the decision to terminate Plaintiff for having campaigned for elective office on DTF time." (Dkt. No. 57-3, ¶ 30; *see id.* ¶ 28 (Boone declaration stating that he was "informed" that "Plaintiff conducted the 2016 Campaign, in part, on DTF time" while he was on medical leave)). Boone "recall[s] there was a discussion" regarding Plaintiff's termination and that he "basically concur[ed]" in the decision to terminate her and that there was a "sound basis" to do so. (Dkt. No. 64-10, at 37–38; *see also* Dkt. No. 64-9, at 66–67 (Manion recalling a "discussion" with Boone)).

Manion also informed Defendant Starr that Plaintiff would be terminated for inappropriate use of DTF resources during a political campaign. (Dkt. No. 57-5, ¶ 12). At Manion's direction, Starr drafted a termination letter, which Manion edited by adding "with cause." (*Id.*; Dkt. No. 57-4, ¶ 15; Dkt. No. 57-5, at 6–7 (termination letter)). The termination letter states: "I am writing to inform you that your services as Deputy Commissioner with the Department of Taxation and Finance are being terminated with cause effective beginning of business August 25, 2016." (Dkt. No. 57-5, at 6).

Manion, with Starr present, informed Plaintiff she was terminated for cause on August 24, 2016. (Dkt. No. 57-4, ¶ 15). Manion did not provide Plaintiff any details about the reason for her termination at this time. (*Id.*). After Plaintiff's termination, Manion learned that Plaintiff was telling people that she was terminated for "political reasons," so Manion arranged for a call with

Plaintiff to discuss her termination. (*Id.* ¶¶ 16–17). On September 2, 2016, Manion had a call

with Plaintiff, and Starr was present in the room with Manion as a witness. (*Id.* ¶ 18). Plaintiff

asked whether her termination "had anything to do" with her campaign. (*Id.*). Manion asserts that

she responded that "the termination occurred because Plaintiff conducted campaign activity at

DTF." (*Id.*; *see also* Dkt. No. 64-9, at 35 ("I said, yes, it had to do with you doing campaigning

at work.")). According to Plaintiff, however, Manion told her that she was fired "for failure to

follow direct orders to not engage in campaign activities at the workplace." (Dkt. No. 57-9, at

164). Although Manion had not received a complaint regarding Plaintiff's campaign activities,

the issue of one of "appearance." (*Id.*).

Plaintiff began working at the Schenectady County Office of the Public Defender in

February 2017. (*See id.* at 19–20). At the time of her deposition in April 2022, Plaintiff served as

the Deputy Chief Assistant Public Defender. (*Id.*).

## III.   STANDARD OF REVIEW

Under Rule 56(a), summary judgment may be granted only if all the submissions taken

together "show that there is no genuine issue as to any material fact and that the moving party is

entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986);

*see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The moving party bears

the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*,

477 U.S. at 323. A fact is "material" if it "might affect the outcome of the suit under the

governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could

return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of

New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*, 477 U.S. at 248). The movant may

meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient

to establish the existence of an element essential to that party's case, and on which that party will

bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (explaining that summary judgment is appropriate where the nonmoving party fails to "'come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor' an essential element of a claim" (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 509 (2d Cir.2010))).

If the moving party meets this burden, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323–24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). Still, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (citing *Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)). Furthermore, "[m]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)).

The Court notes that, while Plaintiff is presently proceeding pro se,[10] she is herself an attorney. While "a court is ordinarily obligated to afford a special solicitude to *pro se* litigants,"

---

[10] Plaintiff was represented at the time she commenced this action in August 2019 and began proceeding pro se in April 2022. (*See* Dkt. No. 53 (granting attorney's motion to withdraw)).

an attorney representing herself "ordinarily receives no such solicitude at all." *Tracy v. Freshwater*, 623 F.3d 90, 101–02 (2d Cir. 2010) (citations omitted).

## IV.   DISCUSSION

Plaintiff's complaint asserts a First Amendment retaliation claim pursuant to Section 1983 against all three Defendants. (*See generally* Dkt. No. 1). Plaintiff seeks money damages and an order reinstating her to her employment with DTF, "with accrued backpay and benefits." (*Id.* at 5). Defendants move for summary judgment, raising a number of arguments as to why Plaintiff's claims fail. (*See generally* Dkt. No. 57-1).

The First Amendment "generally prohibits government officials from dismissing or demoting an employee because of the employee's engagement in constitutionally protected political activity." *Heffernan v. City of Paterson, N.J.*, 578 U.S. 266, 268 (2016) (citations omitted). "To survive summary judgment on a First Amendment retaliation claim, a public employee must bring forth evidence showing" that: (1) she "has engaged in protected First Amendment activity," (2) she "suffered an adverse employment action," and (3) "there was a causal connection between the protected activity and the adverse employment action." *Anemone v. Metro. Transp. Auth.*, 629 F.3d 97, 114 (2d Cir. 2011) (quoting *Dillon v. Morano*, 497 F.3d 247, 251 (2d Cir. 2007)) (internal quotation marks omitted). "The causal connection must be sufficient to warrant the inference that the protected speech was a substantial motivating factor in the adverse employment action," *Barzilay v. City of New York*, --- F. Supp. 3d ---, No. 20-cv-4452, 2022 WL 2657169, at *10, 2022 U.S. Dist. LEXIS 120987, at *35 (S.D.N.Y. July 8, 2022) (citation and brackets omitted), and the plaintiff bears the "initial burden of showing that an improper motive played a substantial part in defendant's action," *Anemone*, 629 F.3d at 114.

If a plaintiff makes out a prima facie retaliation claim, "a government defendant may still receive summary judgment if it establishes its entitlement to a relevant defense." *Id.* As relevant

to the instant motion, a government defendant may escape liability under the *Pickering* balancing test defense if it can demonstrate that "the plaintiff's expression was likely to disrupt the government's activities and that the harm caused by the disruption outweighs the value of the plaintiff's expression." *Barzilay*, 2022 WL 2657169, at *10, 2022 U.S. Dist. LEXIS 120987, at *37 (citation omitted). And the "*Mt. Healthy*" defense allows a defendant to avoid liability, "even if there is evidence that the adverse employment action was motivated in part by protected speech," if it can show that it "would have taken the same adverse action in the absence of the protected speech." *Anemone*, 629 F.3d at 114–15 (quoting *Heil v. Santoro*, 147 F.3d 103, 109 (2d Cir. 1998)); *see also Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977).

Here, Defendants argue they are entitled to summary judgment on the grounds that (1) Plaintiff did not engage in protected speech, (2) Defendants terminated Plaintiff for legitimate reasons, (3) Boone and Starr were not personally involved in Plaintiff's termination, (4) they are entitled to qualified immunity, and (5) Plaintiff's official capacity claims fail as a matter of law. (*See generally* Dkt. No. 57-1).[11]

### A.    Protected Speech

Plaintiff contends that she was terminated in retaliation for her protected activity of campaigning for judicial office. (Dkt. No. 1, ¶ 21). Defendants argue that they are entitled to summary judgment because Plaintiff has failed to provide evidence that she engaged in constitutionally protected speech. (Dkt. No. 57-1, at 16–18). Defendants appear to implicitly concede that Plaintiff's campaigning for a judgeship constitutes protected speech while arguing that "campaigning in the workplace using state resources"—the conduct which they assert led to

---

[11] Defendants do not contest that Plaintiff suffered an adverse employment action. *See Montero v. City of Yonkers*, 890 F.3d 386, 401 (2d Cir. 2018) (noting that "[a]n adverse employment action may include discharging").

her termination—does not. (*Id.*). Defendants argue that Plaintiff has not identified any speech

beyond "participating in a campaign" that she believes led to her termination, (*id.* at 13–14), and

Plaintiff does not appear to dispute this contention, as she asserts in her response to Defendants'

motion that her "campaign" was protected under the First Amendment, (Dkt. No. 64-12, at 15).

Although Plaintiff disputes that she engaged in conduct that would constitute campaigning in the

workplace, (*see id.* at 8 ("Plaintiff never campaigned on state time.")), she has not argued that

such conduct would be protected activity. Thus, the sole protected activity at issue here is

Plaintiff's outside judicial campaign.[12]

"The speech of a public employee is protected by the First Amendment when the

employee speaks as a citizen on a matter of public concern, rather than pursuant to his

employment responsibilities." *Specht v. City of New York*, 15 F.4th 594, 600 (2d Cir. 2021)

(citing *Garcetti v. Ceballos*, 547 U.S. 410, 420–21 (2006)).[13] Assessing whether a public

employee's speech is protected therefore requires consideration of "two separate subquestions":

(1) "whether the employee spoke as a citizen rather than solely as an employee," and (2)

"whether [s]he spoke on a matter of public concern." *Shara v. Maine-Endwell Cent. Sch. Dist.*,

46 F.4th 77, 82–83 (2d Cir. 2022) (quoting *Matthews v. City of New York*, 779 F.3d 167, 172 (2d

Cir. 2015)) (internal quotation marks omitted). If either question "is answered in the negative,"

---

[12] Plaintiff has not identified any specific protected speech that is the subject of her retaliation claim beyond the fact of her campaign. She has not asserted that campaigning during the workplace was protected, and the parties did not address the protected or unprotected nature of discrete pieces of speech such as: discussing campaign events or scheduling at DTF, soliciting addresses from co-workers, or asking whether a co-worker's husband had connected with her campaign Facebook page.

[13] As the Second Circuit has noted, the speech at issue "must come within the protection of the First Amendment to begin with," although this element is "rarely in dispute." *Lynch v. Ackley*, 811 F.3d 569, 578 n.8 (2d Cir. 2016). Thus, although courts sometimes state the "determinative question" in Section 1983 First Amendment retaliation suits as whether employee speech was "constitutionally protected," "such words seem intended as shorthand for whether the speech was constitutionally protected *from employer retaliation*." *Id.* "The test for establishing unconstitutional retaliation for an employee's speech is far more stringent than the test for establishing that speech enjoys protection under the First Amendment." *Id.*

18

the employee's speech is not protected from employer retaliation. *Id.* at 83. If both questions are answered affirmatively, however, a court may consider whether the employer "had an adequate justification for treating the employee differently from any other member of the general public based on the government's needs as an employer." *Id.* (quoting *Matthews*, 779 F.3d at 172); *see also Garcetti*, 547 U.S. at 418.

### 1.  Speech As a Citizen on a Matter of Public Concern

"Whether speech is on a matter of public concern presents a question of law that takes into consideration the content, form, and context of a given statement." *Specht*, 15 F.4th at 600 (citing *Montero*, 890 F.3d at 399). "Speech deals with matters of public concern when it can be fairly considered as relating to matters of political, social, or general interest to the community or value and concern to the public." *Id.* (citing *Snyder v. Phelps*, 562 U.S. 443, 453 (2011)). In assessing whether a public employee speaks as a citizen, courts may consider "whether the employee's speech falls outside of [her] official responsibilities" and "whether a civilian analogue" to the employee's speech exists. *Shara*, 46 F.4th at 83 (citations omitted). The "heart" of this analysis is "whether the speech at issue is itself ordinarily within the scope of an employee's duties." *Id.* (quoting *Montero*, 890 F.3d at 397–98).

The Court concludes that Defendants are not entitled to summary judgment on the ground that Plaintiff did not engage in any protected speech. Plaintiff argues that her "campaign" was protected and that campaigning for public office "inherently involves matters of public concern." (Dkt. No. 64-12, at 13–15). The Court agrees that campaigns for public office, generally speaking, are likely to "relat[e] to matters of political, social, or general interest to the community or value and concern to the public." *Specht*, 15 F.4th at 600; *see also Dushane v. Leeds Hose Co. #1 Inc.*, 6 F. Supp. 3d 204, 211–12 (N.D.N.Y. 2014) (finding it "likely that [the plaintiff's] mere candidacy for the position . . . is protected by the First Amendment" and

collecting cases); *see also Castine v. Zurlo*, 756 F.3d 171, 176 n.5 (2d Cir. 2014) (noting that "running for public office" is speech generally protected by the First Amendment but declining to decide whether it also qualified for protection from government-employer retaliation). Second, there is no argument or evidence here to suggest that any of Plaintiff's outside campaign activities were ordinarily within the scope of her duties as a DTF employee or that Plaintiff did not speak as a private citizen. Thus, because Defendants have not made any argument that Plaintiff's campaign did not constitute citizen speech on a matter of public concern, the Court will consider the 2016 Campaign as protected speech for purposes of resolving Defendants' motion.

### 2.    *Pickering* Balancing Test

Even when a public employee engaged in speech which would otherwise be protected from employer retaliation by the First Amendment, a government defendant may nonetheless escape liability if it can show that it "had an adequate justification for treating the employee differently [based on his or her speech] from any other member of the general public." *Montero*, 890 F.3d at 395 (quoting *Garcetti*, 547 U.S. at 418). Under this defense, which is commonly referred to as the *Pickering* balancing test, "a government employer may take an adverse employment action against a public employee for speech on matters of public concern if: (1) the employer's prediction of the disruption that such speech will cause is reasonable; (2) the potential for disruption outweighs the value of the speech; and (3) the employer took the adverse employment action not in retaliation for the employee's speech, but because of the potential for disruption." *Anemone*, 629 F.3d at 115 (citation and brackets omitted); *see also Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968); *Barzilay*, 2022 WL 2657169, at *27, 2022 U.S. Dist. LEXIS 120987, at *98 (noting that the *Pickering* defense "assumes that [the employer's] action was taken based on speech that would be protected if not for its disruption to the government

operations"). The weighing of the competing interests is a question of law for the court, *Jackler v. Byrne*, 658 F.3d 225, 237 (2d Cir. 2011) (citations omitted), and the State's burden in justifying a particular adverse employment action "varies depending on the nature of the employee's expression," *Connick v. Myers*, 461 U.S. 138, 150 (1983); *see also Waters v. Churchill*, 511 U.S. 661, 677 (1994) (plurality opinion) (holding that the *Pickering* balancing test should be applied to the facts as the employer reasonably found them to be); *id.* at 685 (Souter, J., concurring) (agreeing with the plurality opinion's "reasonableness test"). Thus, a court must consider the extent to which the employee's speech touches on a matter of public concern and the nature of the employee's position. *See Barzilay*, 2022 WL 2657169, at *28, 2022 U.S. Dist. LEXIS 120987, at *99–100. The defendant bears the burden of establishing this defense. *Anemone*, 629 F.3d at 115.

Here, although Defendants allude to the *Pickering* balancing test in their memorandum of law, (*see* Dkt. No. 57-1, at 17), they make no argument or showing that they reasonably believed Plaintiff's campaign generally would cause disruption to DTF operations or that any such disruption outweighed the value of Plaintiff's speech. Therefore, on this record—where Plaintiff claims she was terminated for participation in the 2016 Campaign and Defendants claim she was terminated for campaigning on state time in the workplace—the Court does not consider any defense under *Pickering* at this juncture. *See Caruso v. City of New York*, 973 F. Supp. 2d 430, 458 (S.D.N.Y. 2013) (finding summary judgment based on *Pickering* inappropriate where the defendants had "not moved for summary judgment on this ground" and neither party had "submitted specific evidence or arguments regarding this balancing").

### B.  Causation

Defendants next argue that, even assuming Plaintiff can establish a prima facie retaliation claim, the evidence demonstrates that Plaintiff was terminated for a legitimate, non-retaliatory

reason: Plaintiff's failure to follow directives to abstain from campaigning at DTF or using DTF resources. (Dkt. No. 57-1, at 18–20).[14] Plaintiff responds that she need only establish that her protected speech was a "substantial motivating factor" in the decision to terminate her and that Defendants' assertion that Plaintiff was fired for campaigning on state time and using state resources is "newly concocted" and "wholly unreasonable." (Dkt. No. 64-12, at 15–18).

According to Plaintiff, Manion told her that she was fired "for failure to follow direct orders to not engage in campaign activities at the workplace." (Dkt. No. 57-9, at 164). Manion's reference to Plaintiff's campaign during the termination connects the protected conduct to the adverse action. *See Smith v. County of Suffolk*, 776 F.3d 114, 121–22 (2d Cir. 2015) (finding material issue of fact as to causation where "[t]he plain language of several of the disciplinary charges at the heart of the adverse actions directly implicates not only the fact that Smith had engaged in protected speech, but also the content of that speech"). At this stage of the proceedings, drawing all reasonable inferences in Plaintiff's favor, a factfinder could conclude that Defendants' actions were motivated by retaliatory animus.

The *Mt. Healthy* defense is available in cases "where the employer does not dispute that there is evidence of an impermissible reason for the adverse employment action but 'the basis for the adverse action is not either the improper or the proper reason, but both reasons.'" *Barzilay*, 2022 WL 2657169, at *22, 2022 U.S. Dist. LEXIS 120987, at *78 (quoting *Brock v. Casey Truck Sales, Inc.*, 839 F.2d 872, 877 (2d Cir. 1988)). At summary judgment, the "operative question" is whether the defendant has "demonstrated that a reasonable jury *would have to find*

---

[14] While unclear, Defendants appear to be asserting a *Mt. Healthy* defense, under which they may avoid liability by demonstrating by a preponderance of the evidence that they would have taken the same adverse employment action even in the absence of Plaintiff's protected activity. *See Barzilay*, 2022 WL 2657169, at *22 n.6, 2022 U.S. Dist. LEXIS 120987, at *78 n.6 (distinguishing between dual motivation and pretext cases); *see also Deep v. Coin*, 453 F. App'x 49, 55 (2d Cir. 2011) (summary order) ("[W]e have never identified pretext as a relevant factor in considering a First Amendment retaliation claim under *Mt. Healthy*.").

by a preponderance of the evidence that [the defendant] would have" taken the adverse employment action at issue "absent [the plaintiff's] [protected] speech." *Smith*, 776 F.3d at 122 (emphasis added). "Put one way, 'the unprotected conduct, standing alone, must justify the adverse actions.'" *Barzilay*, 2022 WL 2657169, at *23, 2022 U.S. Dist. LEXIS 120987, at *79 (quoting *Smith*, 776 F.3d at 122) (brackets omitted); *see generally id.*, 2022 WL2657169, at *22–23, 2022 U.S. Dist. LEXIS 120987, at *77–79 (discussing the *Mt. Healthy* defense).[15]

Here, the Court concludes that Defendants have not met their burden of showing that a "reasonable jury would have to find by a preponderance of the evidence" that they would have terminated Plaintiff even absent Plaintiff's protected speech—i.e., the 2016 Campaign. *Smith*, 776 F.3d at 122. Manion asserts that she told Plaintiff that her termination "had to do with [her] campaigning at work," while Plaintiff maintains Manion stated that she was fired "for failure to follow direct orders to not engage in campaign activities at the workplace." (Dkt. No. 64-9, at 35; Dkt. No. 57-9, at 164). Further, Plaintiff has raised a question of fact as to whether she in fact campaigned on State time or in the DTF workplace, (*see, e.g.*, Dkt. No. 64-1, ¶ 16 (Plaintiff asserting that she maintained flexible work hours); Dkt. No. 64-1, ¶ 27 (Plaintiff denying that she conducted any activities relating to the 2016 Campaign at DTF)), and as to the findings made by OIA which purportedly led to her termination, (*see* Dkt. No. 64-6 (OIA report containing no specific substantiated findings of improper resource use)).[16] On this record the Court cannot say that a reasonable juror would have to conclude that Defendants would have terminated Plaintiff

---

[15] Both Defendants and Plaintiff suggest that the reasonableness test from *Waters* applies to the *Mt. Healthy* defense. (*See* Dkt. No. 57-1, at 21 n.6; Dkt. No. 64-12, at 16). However, *Waters* involved application of the *Pickering* test. The parties have not cited any authority, and the Court has found none, which applies a *Mt. Healthy* defense to the facts as the defendant employer reasonably found them. Indeed, the *Mt. Healthy* defense is applicable to cases where an improper motivation is already conceded or established.

[16] Plaintiff's claim throughout this case has been that she was retaliated against based upon the campaign itself. Although she disputes engaging in campaign activities at work, she has, at no point, argued that such activities were protected speech.

absent an impermissible motivation to retaliate for her campaign. *See Barzilay*, 2022 WL 2657169, at *23, 2022 U.S. Dist. LEXIS 120987, at *80–81 ("If, viewing the evidence in the light most favorable to Plaintiff[] and taking all reasonable inferences in [her] favor, reasonable jurors could differ as to whether Defendants would have taken the same adverse employment action[] in the absence of Plaintiff['s] protected speech, then summary judgment must be denied and the question whether Defendants' actions rested on permissible grounds must be left to the jury."); *see also Greenwich Citizens Comm., Inc. v. Counties of Warren & Washington Indus. Dev. Agency*, 77 F.3d 26, 32 (2d Cir. 1996) ("[A]lthough the language in *Mt. Healthy* refers to the plaintiff's *conduct*, the Court's analysis, properly understood, attempts to weigh the impact of the defendant's *impermissible reason* on the defendant's decision to act."). Thus, summary judgment on a *Mt. Healthy* defense is not proper.

### C.   Personal Involvement

It is well-settled that, to establish a defendant's individual liability in a suit brought under Section 1983, a plaintiff must show "the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013) (citations omitted). A plaintiff must "allege a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). There is "no special rule for supervisory liability," and "a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'" *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)). Defendants argue that Plaintiff's claims against Boone and Starr must be dismissed because these Defendants were not personally involved in Plaintiff's termination. (Dkt. No. 57-1, at 20–23; Dkt. No. 65, at 3).

### 1.      Defendant Boone

Defendants first argue that the mere fact that Boone approved the decision to terminate Plaintiff is insufficient to establish his personal involvement in any alleged violation of Plaintiff's First Amendment rights. (Dkt. No. 57-1, at 21–23; *see also id.* at 20 (arguing that "the evidence shows Defendant Boone did not take action against Plaintiff for engaging in any conduct, protected or otherwise")). Plaintiff responds that Boone did more than merely approve the termination because he was regularly involved in the hiring and firing of employees, participated in discussions regarding Plaintiff's approval for the 2016 Campaign and the decision to terminate her, and "had the opportunity" to remedy a potential wrong when Manion told him about Plaintiff's termination. (Dkt. No. 64-12, at 18–19).

The Court concludes that there is evidence from which a reasonable jury could find that Boone was personally involved in the decision to terminate Plaintiff. First, Boone was Commissioner of DTF at the relevant time, and he testified at his deposition that he generally had responsibilities in the area of hiring and firing of employees. (Dkt. No. 64-10, at 32). Boone was involved in the approval of Plaintiff's request to conduct the 2016 Campaign and was aware of the restrictions that DTF and JCOPE placed on that outside activity. Furthermore, Boone testified that, when "concerns" regarding Plaintiff's conduct of the 2016 Campaign were brought to his attention, his "direction" was "for [Manion] to work with human resources . . . and counsel and investigations to ensure there was a sound process followed." (*Id.* at 36–37). Boone recalls "a discussion" about Plaintiff's termination and that Manion informed him of "the results of [her] finding and here's how [she] wish[ed] to proceed." (*Id.* at 37). Boone's reaction was to "[m]ake sure counsel and HR are looped in," and he "basically concurr[ed] in this decision that there's a sound basis for [the termination]." (*Id.* at 38). Viewing this evidence in the light most favorable to Plaintiff, a reasonable jury could conclude that Boone was sufficiently personally involved in

the decision to terminate Plaintiff by virtue of his participation in discussions about the decision and his concurrence with or approval of that decision. It would be a reasonable inference to draw that, had Boone, as Manion's superior, expressed disagreement with the stated decision to terminate Plaintiff, Manion may not have carried out the termination. Furthermore, Boone was aware of the conduct at issue and thus could have acted in retaliation for that activity. (Dkt. No. 57-3, ¶ 28 ("While out on medical leave, I was informed that . . . Plaintiff conducted the 2016 Campaign, in part, on DTF time.")).

Thus, the Court denies Defendants' motion for summary judgment in favor of Boone for lack of personal involvement.

### 2.    Defendant Starr

Defendants also argue that Starr is entitled to summary judgment because Starr "took action because the senior official at the agency told her to do so" and, by the time Starr became involved in the process of terminating Plaintiff, "the decision to terminate had already been made." (Dkt. No. 57-1, at 20). Defendants further argue that there is no evidence demonstrating that Starr "took action *because* of any protected speech." (*Id.*). Plaintiff does not respond to this argument.

The Court agrees with Defendants that the undisputed evidence shows that Starr had no involvement in the decision to terminate Plaintiff and that her participation in the process began only once the decision to take that adverse employment action had already been made. (Dkt. No. 57-5, ¶ 12; Dkt. No. 57-4, ¶ 15). Even then, Starr's participation was limited to drafting a standard termination letter at Manion's direction and serving as a witness to Plaintiff's termination on August 24, 2016 and the September 2, 2016 phone call. These ministerial tasks are insufficient to show that Starr, by her own individual actions, violated Plaintiff's First Amendment rights. *See Brown v. Office of State Comptroller*, 211 F. Supp. 455, 476 (D.

Conn. 2016) (noting that there must be a sufficient connection between a state official and the adverse employment action, especially where the state official has "no actual authority over the plaintiff's employment status"); *Schallop v. N.Y.S. Dep't of Law*, 20 F. Supp. 2d 384, 393 (N.D.N.Y. 1998) (finding no personal involvement where the defendant's testimony "indicate[d] that she was being informed of a decision that had been made without her involvement"). There also is no evidence that Starr took any of these actions for the improper purpose of retaliating against any protected speech. Accordingly, Starr is entitled to summary judgment.

### D.    Qualified Immunity

Defendants argue that they are entitled to qualified immunity on Plaintiff's First Amendment retaliation claim because "it was not clearly established that Plaintiff could not be terminated for conducting political activity in the workplace" and Defendants' actions could reasonably have been thought consistent with the rights they are alleged to have violated. (Dkt. No. 57-1, at 23–25). Plaintiff responds that Defendants' qualified immunity defense cannot be assessed at this time because "an issue of fact exists as to whether Plaintiff was fired for simply . . . engaging in protected free speech activity or . . . for campaigning on state time" and "[n]o reasonable person could possibly believe that terminating an employee for the former was appropriate." (Dkt. No. 64-12, at 19–20).

Public officials are entitled to qualified immunity on a Section 1983 claim "unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time." *Radwan v. Manuel*, 55 F.4th 101, 113 (2d Cir. 2022) (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018)) (internal quotation marks omitted); *see also generally Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The Court may exercise its discretion "in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case." *Radwan*, 55 F.4th

at 113–14 (quoting *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)). Qualified immunity is an

affirmative defense on which defendants bear the burden of proof. *Vincent v. Yelich*, 718 F.3d

157, 166 (2d Cir. 2013). To demonstrate entitlement to summary judgment based on qualified

immunity, a defendant must

> adduce[] sufficient facts such that no reasonable jury, looking at the
> evidence in the light most favorable to, and drawing all inferences
> most favorable to, the plaintiffs, could conclude that it was
> objectively unreasonable for the defendant to believe that [it] was
> acting in a fashion that did not clearly violate an established
> federally protected right.

*Hartline v. Gallo*, 546 F.3d 95, 102 (2d Cir. 2008) (citation and brackets omitted).

     Here, Defendants rely on the second prong of the qualified immunity analysis and argue

that, even assuming they violated Plaintiff's First Amendment rights, the unlawfulness of their

conduct was not clearly established. (*See* Dkt. No. 57-1, at 24–25; Dkt. No. 65, at 7 (arguing that

"it was reasonable for [Defendants] to believe that an employee could be terminated for

misappropriating employer resources no matter the reason")). In light of the factual disputes as to

whether Defendants could successfully assert a defense under *Mt. Healthy*, the Court cannot

assess Defendants' qualified immunity defense at this juncture. The Court therefore denies

Defendants' request for qualified immunity at this stage of the proceedings.

     **E.**    **Official Capacity Claims**

     Defendants argue that the court should dismiss the official capacity claims because

Plaintiff failed to allege that any defendant could provide the prospective relief sought. (Dkt. 57-

1, at 25). Plaintiff responds that because Defendants were sued in their official capacities, DTF is

a real party in interest to this suit, and the agency is able to provide the requested injunctive relief

of reinstatement. (*See* Dkt. 64-12, at 21–22).

Sovereign immunity bars a suit in federal court against a state, absent the state's consent to suit or congressional abrogation of immunity. *See Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54–55 (1996); *see also* U.S. CONST. amend. XI. However, under the exception to this rule set forth in *Ex parte Young*, 209 U.S. 123 (1908), "a plaintiff may sue a state official acting in his official capacity—notwithstanding the Eleventh Amendment—for prospective, injunctive relief from violations of federal law." *State Emps. Bargaining Agent Coal. v. Rowland*, 494 F.3d 71, 95 (2d Cir. 2007) (citation omitted).[17] "In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (citation omitted).

Even assuming Plaintiff has otherwise satisfied the requirements of the *Ex parte Young* exception, Plaintiff has nonetheless failed to sue the proper parties. The *Ex parte Young* exception to sovereign immunity "only authorizes suit against officials with the authority to provide the requested relief." *Siani v. State Univ. of N.Y.*, 7 F. Supp. 3d 304, 317 (E.D.N.Y. 2014) (citations omitted). "An action does not abate when a public officer who is a party in an official capacity . . . ceases to hold office while the action is pending. The officer's successor is automatically substituted as a party." Fed. R. Civ. P. 25(d); *see D'Alessandro v. City of New York*, 713 F. App'x 1, 8 n.9 (2d Cir. 2017) (summary order). But if a public officer ceases to hold office *before* the action is pending, it is improper for a plaintiff to name such officer as a defendant in his or her official capacity. *See Marshall v. Annucci*, No. 16-cv-8622, 2018 WL

---

[17] Suits for money damages against state officials in their official capacities remain barred. *See Kentucky v. Graham*, 473 U.S. 159, 169 (1985); *see also Severino v. Negron*, 996 F.2d 1439, 1441 (2d Cir. 1993) ("[I]t is clear that the Eleventh Amendment does not permit suit [under Section 1983] for money damages against state officials in their official capacities.").

1449522, at *8, 2018 U.S. Dist. LEXIS 47534, at *24–25 (S.D.N.Y. Mar. 22, 2018) (dismissing official capacity claims against retired officials because "[t]he retired Defendants do not have the authority to rectify any ongoing constitutional violations. Accordingly, Plaintiff cannot appropriately seek prospective injunctive or declaratory relief against them."); *see also Massachusetts Hosp. Ass'n, Inc. v. Harris*, 500 F. Supp. 1270, 1283 (D. Mass. 1980) ("Neither [defendant] now serves the Commonwealth in any relevant official position. Neither did so at the time the amended complaint was filed. Thus, it was improper to name them as defendants in their official capacity."); *see also Michalik v. Hermann*, No. 99-cv-3496, 2001 WL 434489, at *2, 2001 U.S. Dist. LEXIS 5457, at *9 (E.D. La. Apr. 26, 2001) ("When suit was filed, [defendants] had no official duties and had no official capacity in which to be sued.").

Here, it is undisputed that Plaintiff filed the complaint against Defendants Boone, Manion, and Starr after each Defendant had retired from DTF. (*See* Dkt. No. 1; Dkt. No. 57-3, ¶¶ 3, 7, 32; Dkt. No. 57-4, ¶¶ 3–4; Dkt. No. 57-5, ¶¶ 3–4). When Plaintiff first filed the lawsuit, the named Defendants no longer had any official capacity at DTF, and accordingly, no longer held the authority to provide injunctive relief to Plaintiff through reinstatement. Plaintiff nonetheless argues that the official capacity suits against Defendants were effectively suits against DTF. (*See* Dkt. 64-12, at 21 (quoting *Graham*, 473 U.S. at 166 ("As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."))). However, as discussed, Plaintiff did not in fact sue any Defendant with an official capacity at DTF. Moreover, even if DTF were a real party in interest to this lawsuit, Plaintiff's argument that "the agency itself would have the ability to provide the injunctive relief," (Dkt. No. 64-12, at 22), is flawed. The *Ex parte Young* exception for prospective injunctive relief "only contemplates action brought

against individual defendants in their official capacities, and 'has no application in suits against the States and their agencies, which are barred regardless of the relief sought.'" *Mann v. N.Y. State Ct. of Appeals*, No. 21-cv-49, 2021 WL 5040236, at *5, 2021 U.S. Dist. LEXIS 209018, at *13–14 (N.D.N.Y. Oct. 29, 2021) (quoting *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993)). Plaintiff has not brought any official-capacity claim against a DTF official who has the ability to provide the injunctive relief she seeks.

Thus, the Court concludes that Plaintiff's official capacity claims against Defendants Boone, Manion, and Starr must be dismissed.

## V.   CONCLUSION

For these reasons, it is hereby

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 57) is **GRANTED in part**; and it is further

**ORDERED** that Plaintiff's First Amendment retaliation claim against Defendant Mary Starr is **DISMISSED with prejudice**; and it is further

**ORDERED** that Plaintiff's official capacity claims as to all Defendants are **DISMISSED without prejudice**; and it is further

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 57) is otherwise **DENIED**.

**IT IS SO ORDERED.**

Dated: <u>February 28, 2023</u>
Syracuse, New York

Brenda K. Sannes
Chief U.S. District Judge